BURKE, Judge.
Willie B. Smith III appeals the circuit court’s denial of his Rule 32, Ala. R.Crim. P., petition for postconviction relief challenging his May 7, 1992, conviction of two counts of capital murder and the resulting sentence of death. Smith was convicted of the intentional murder of Sharma Ruth Johnson during a kidnapping, § 13A-5-40(a)(1), Ala.Code 1975, and the intentional murder of Sharma Ruth Johnson during a robbery, § 13A-5-40(a)(2), Ala.Code 1975. The facts of this case are set out in this Court’s opinion on return to remand. See Smith v. State, 838 So.2d 413, 421-25 (Ala.Crim.App.2002). Briefly, Smith was convicted of abducting the female victim from the automatic teller “ATM” site of a bank, with the aid of an accomplice who approached the victim from her front passenger’s window, and inquired as to the location of a Krystal’s Hamburger restaurant. Smith then approached the vehicle at the front driver’s window, armed with a gun, and forced the victim into the trunk. After driving away in the vehicle, he returned to the ATM. He forced the victim to provide her password and used the victim’s debit card to withdraw funds. A surveillance camera recorded Smith using the victim’s card. He drove around with her in the trunk, taunting her with sexual threats when she cried for help. After picking up another passenger, he drove her to a cemetery where he shot her execution-style. Smith abandoned the car, but later returned to the car and burned it. He admitted committing the offense to other witnesses, one of whom was an informant who was wired when Smith made the admission.
On appeal, this Court remanded this case, pursuant to J.E.B. v. State, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), for a hearing to be held and the prosecutor to come forward with his reasons for striking female veniremembers. The trial court was thereafter to determine whether the prosecutor had removed females from the jury in a discriminatory manner. Smith v. State, 698 So.2d 1166 (Ala.Crim.App.1997). On return to remand, this Court affirmed the trial court’s judgment, Smith v. State, 838 So.2d 413 (Ala.Crim.App.2002), and the Alabama Supreme Court denied certiorari review on June 28, 2002. On December 16, 2002, Smith’s petition for a writ of certiorari to the United States Supreme Court was denied.
Smith filed a Rule 32 petition on August 1, 2003, and, following a motion by the State arguing that certain of his claims were insufficiently pleaded, he was granted leave to amend his petition. The State also filed a motion to dismiss certain of Smith’s claims that presented no material issue of law or fact and an answer responding to each of Smith’s claims. Smith responded to the State’s filing, and the State in turn responded to Smith’s response.
*1114 Smith ñled an amended Rule 32 petition on May 31, 2005. Smith’s appellate counsel’s motion to withdraw was granted and new appellate counsel was appointed. The State filed an answer to Smith’s claims and a motion to dismiss certain claims that were proeedurally barred, insufficiently pleaded, or failed to present any material issue of fact or law, pursuant to Rules 32.3, 32.6(b), and 32.7(d), Ala. R.Crim. P. The State also filed a motion to conduct a mental evaluation of Smith.
Smith filed his second amended Rule 32 petition on November 26, 2007. The State filed an answer to Smith’s second amended petition, responding to each claim and concluding that relief should be denied on all claims except his claim that he is mentally retarded. The State acknowledged that an evidentiary hearing should be held as to that claim.[1] One of Smith’s attorneys was then allowed to withdraw and Smith filed a response to the State’s answer, arguing that he was entitled to a hearing; that the “Flynn Effect” indicated that he was retarded; that he was entitled to discovery concerning his retardation, his mental- and physical-health history, and his ineffective-assistance-of-counsel claims; that the effects of his allergic reaction to Haldol prejudiced him at trial during both the guilt phase and the penalty phase; and that his ineffective-assistance claims were not insufficiently pleaded because the State had not provided him with the necessary requested records.
On November 12, 2008, a hearing was held as to Smith’s claims in his second amended Rule 32 petition. Smith’s counsel stated that evidence would be presented concerning only those issues raising factual disputes. Smith asked that the court simply rule as to the remaining issues, which raised only questions of law and whether they were precluded or insufficiently pleaded. The court indicated that it would do so after the hearing. The two basic issues presented at the hearing concerned claims of ineffective assistance of trial counsel and whether Smith was mentally retarded.
As to his claims of ineffective assistance of counsel, Smith introduced a declaration from one of his five counsel representing him at the hearing, stating that she had made diligent efforts to obtain the testimony of Smith’s lead trial counsel. She had contacted him by telephone in Florida, but he had indicated that he was unwilling to return to Alabama to testify concerning his representation of Smith. However, the attorney who had assisted in representing Smith, and who was notably responsible for representing him during the penalty phase, testified at the hearing. She stated that she had been admitted to the Alabama State Bar eight months before Smith’s trial and that his trial had been her first trial as a practicing attorney. She had been hired by Smith’s lead counsel, who had already been working on Smith’s case. She stated that during the guilt phase, she “was observing and assisting [lead counsel] in any way necessary.” (R. 39.) She did not present evidence or examine witnesses during that time.
She testified that her role during the penalty phase, however, was to interview witnesses beforehand and then to examine them at trial. She further stated that lead counsel had discussed the relevance of various mitigating factors with her and had presented half of the closing argument. She stated that she had interviewed people in the community and family members but did not interview any experts. She ac *1115 knowledged that the court had ordered a competency test to be performed on Smith before trial by Dr. C.J. Rosecrans. Smith’s lead counsel had retained a psychologist, Dr. Alan Blotcky, to evaluate Smith, and the witness stated that she believed that she also had met with Dr. Blotcky. Dr. Blotcky’s report, following administering the test pursuant to the Wechsler Adult Intelligence Scale Revised (WAIS-R), indicated that Smith had a verbal IQ of 75, placing him in the borderline range of intelligence. Smith’s attorney testified that she did not believe that any full IQ testing or any other psychological, intelligence, or drug testing had been performed on Smith.
On cross-examination, the witness recalled that a clinical psychologist, Dr. Allen Shealy, had been retained by the defense to aid in jury selection. She also testified that she had attempted to obtain Smith’s school records because he had indicated that he had been in special-education classes. Because the school no longer had the records, the assistant principal had been called to testify at the penalty phase. She testified that the fee declarations indicated that the lead counsel had also spoken to a psychiatric social worker whom the witness believed to be Donna Click, who had worked at the jail. Smith never complained to the witness of having been “given stuff at the jail that made him not feel right.” (R. 61.) She stated that the lead counsel had been with her during the guilt and penalty phases and that she had discussed the interviews that she had completed with him. However, she complained that the lead counsel had not been very helpful. The prosecutor noted that the witness had presented testimony that Smith had a severe drug problem from the age of 17 and that he had had a difficult childhood.
Dr. Karen Lee Salekin testified that she administered the Stanford-Binet Intelligence Skills, Fifth Edition (Stanford-Bi-net), test to Smith. She also administered the Scales of Independent Behavior-Revised (SIB-R) test to Smith’s family members concerning what skills he reflected at age 17. She testified that the SIB-R test indicated that Smith had an overall score of 67, indicating that it would be very difficult for him to participate in age-appropriate activities. He also scored a 61 as to motor skills, which score raised the same implications of limited ability. He was also limited as to social interaction and communications skills, and limited to age-appropriate level (which category does not indicate that functioning in this area was as “difficult”) as to community-living skills. (R. 80.)
Dr. Salekin testified that the “Flynn Effect” “is a gradual increase in measured IQ score over the course of time” and indicates “that each year there’s an increase in IQ score by .3, leading to a three-point increase in measured IQ in a ten-year span.” (R. 81.) On cross-examination, the prosecutor elicited testimony that the manual used by psychiatrists and psychologists to diagnose mental conditions does not recommend adjusting IQ scores to conform to the “Flynn Effect.” Dr. Salekin further acknowledged that there was no national consensus about whether the “Flynn Effect” should be applied to IQ tests.
Moreover, the prosecutor also elicited testimony from Dr. Salekin that a drawback of the SIB-R was that it was reliant upon the memory of the test taker. In this case, Dr. Salekin had testified as to Smith’s score pursuant to the testing of Smith’s brother, who had been in prison since 1993 or 1994 and who had had no contact with Smith; therefore he was relying on 30-year-old memories of Smith. She further acknowledged that she had *1116 gotten different results as to Smith when she administered the SIB-R test to Smith’s mother.[2] She acknowledged that the test “was not normed for individuals to take ... thirty years later to reach into their memories and try to remember these things from so long ago.” (R. 96.)
The prosecutor then introduced evidence that Dr. Salekin had also administered the Woodcock Johnson III test to Smith, which relates directly to school functioning in order to assess mental retardation. Smith had scored either one standard below the mean, in the mean, or slightly above average in each category. A number of these categories fell outside (above) the range for even mild mental retardation. Dr. Salekin further testified that drug and alcohol abuse, rather than mental retardation, could affect adaptive functioning. Finally, Dr. Salekin testified that she was retained to do a mitigation evaluation and an Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), evaluation. She concluded that Smith did not suffer from mental retardation.
Dr. Daniel Marson, a clinical neuropsy-ehologist, conducted an evaluation of Smith to determine if there were any cognitive deficits or emotional and personality issues present and, if so, to relate them to possible neurological injuries Smith may have sustained. As to some of the categories for which Smith was tested, he scored in the low average to mildly deficient range, and Dr. Marson stated that “there’s an indication that he has trouble learning new material.” (R. 136.) As to the tests concerning his personality, mood, and emotions, he scored as severely impaired. On cross-examination, the prosecutor pointed out that there were tests on which Smith had performed in the average range or the borderline between the average and above-average range.
Dr. William Alexander Morton, Jr., a professor of pharmacy practice and a clinical social professor of psychiatry, testified that his specialty was psychopharmacolo-gy, which concerns prescribed drugs for psychiatric disorders and other medicines that might have psychiatric effects, as well as illicit substances that affect the brain. He testified that he reviewed Smith’s medical records, school records, and his trial transcript. He also spoke on the phone with Smith’s mother and sister, and interviewed Smith. Morton testified that Smith had reported to him that he was allergic to Haldol, which is an antipsychotic medication. He explained that Haldol “settles one down” and reduces the brain’s activity. (R. 171-72.) One of Smith’s counsel introduced some medical records from Holman Correctional Facility in which Smith had reported that his tongue was thick and that he was having difficulty breathing, and that he had previously taken medicine, including Haldol, at the prison. The records indicated that his tongue appeared thick but that no respiratory distress was noted. However, Dr. Morton testified that the records indicated that he was under distress due to “significant side effects” and had to be treated for about a week to reverse these side effects. (R. 179.) Dr. Morton testified that the effects of Haldol can include difficulty breathing and muscular difficulties, as well as making a person “be relatively unexpressive and uninvolved.” (R. 184.) He testified that Haldol can make a person appear to lack emotion, speak in a flat monotone, and be less spontaneous. When referred to other evaluations of Smith, including the competency report, Dr. Morton testified that Haldol could have affected Smith’s *1117 aloof and detached responses. Smith’s counsel then pointed to two portions of the prosecutor’s closing argument from trial in which he had stated that he did not see any remorsefulness from Smith and that Smith had no compassion. Dr. Morton testified that, based on conversations with Smith’s mother and sister, Smith appeared to be under the influence of Haldol at trial.
On cross-examination, Dr. Morton acknowledged that he did not have any medical record indicating that Smith had been prescribed Haldol by a doctor. Moreover, an Inpatient Progress Notes document contained a notation that the files had been reviewed to determine whether Smith had been given Haldol, and they[3] had found no indication of that. The prosecutor also verified through Dr. Morton that those records were posttrial and would not have been available to him at trial. The record in which Smith complained of a thick tongue and inability to breathe was dated months after trial, and Dr. Morton verified that those symptoms would have manifested within a few days of taking Haldol and may have recurred for a few weeks. Dr. Morton further acknowledged that it was possible that severe abuse of alcohol and cocaine, as admitted by Smith, might result in effects similar to those caused by Haldol.
Following Dr. Morton’s testimony, Smith renewed a motion to have an evaluation of Smith by Dr. C. Van Rosen using the newest Wechsler Adult Intelligence Scale (WAIS) test and to have the test made part of the record following the hearing, or to reopen the hearing thereafter to allow the State to cross-examine the person who administered the test. The prosecutor responded by requesting a ruling by the court as to the issue of retardation and arguing that Dr. Salekin had testified that Smith was not retarded and that Dr. Morton’s testimony did not address retardation. Moreover, the prosecutor contended that another test, the newest test, was not necessary.
Smith’s counsel responded that they believed that they had met their burden of proof as to mental retardation and that they were further raising other issues of mental incapacity, such as the administration of Haldol. The court ruled that the testing by Dr. Van Rosen was allowed and the results should be submitted to the State as well as defense and that the State would be given time to evaluate the results. The results were then to be made a part of the record by affidavit.
Smith put in the record a copy of “The Alabama Lawyer,” a publication of the Alabama State Bar, that indicated that Smith’s lead trial attorney had been disbarred. Smith also requested to listen to a tape of a confidential informant’s conversation with Smith that had been recorded outdoors and that was partially inaudible. A transcript of the tape had been admitted at trial. Smith argued that they were given the tape only eight days before the hearing. However, the prosecutor responded that the tape had not been in the district attorney’s file but had to be acquired from the police department.
Finally, at the hearing, the State presented the testimony of Dr. Glen David King, a clinical and forensic psychologist, as well as an attorney, who testified that he was retained by the State to evaluate Smith.[4] He testified that the purpose of *1118 his examination was as to determine the presence of any mental retardation, mental illness, or psychopathology. He testified that he had reviewed “numerous and voluminous documents” concerning Smith, including the evaluations by Dr. Rosecrans and Dr. Blotcky, and had interviewed and examined Smith. (R. 250.) To test Smith’s intelligence, Dr. King administered the WAIS-III test and Smith received a verbal score of 75, a performance score of 74, and a full-scale score of 72. Dr. King further tested Smith using the Wide Range Achievement Test 4th edition (WRAT-4) concerning an individual’s ability to read, write, and perform arithmetic.[5] The results indicated that Smith was reading at the 8.6 grade level; that he was spelling at the 11.5 grade level; and that he was doing math computation at the 6.3 grade level. As to an adaptive-behavior assessment, Dr. King performed the Adaptive Behavior Assessment System, 2d edition (ADAS-2) and the Minnesota Mul-tiphasic Personality Inventory, 2d edition (MMPI-2). The ADAS-2 tests various functions, such as communication skills, leisure, self-direction, and community use, while the MMPI-2 tests for psychotic symptoms, anxiety symptoms, depressive symptoms, and other areas of functional psychopathology. Dr. King testified that the MMPI-2 is a self-administered, true-false test that includes indicators to reveal if the person being tested is attempting to alter his or her score so that he or she appears to have a mental illness when he or she does not, or appears not to have a mental illness when he or she does. Dr. King testified that Smith’s test results were invalid and that his score indicated that he either attempted to feign a mental illness or that he randomly “sorted items.” (R. 264.)
As to the ADAS-2, Dr. King stated, on cross-examination, that the test indicated that Smith-had difficulties in the areas of community use, health and safety, self-direction, social skills, and leisure skills.
Dr. King testified that he noticed no difficulties in Smith’s communicating with him or understanding questions. Dr. King further testified that, in his opinion, Smith was not mentally retarded and functioned in the high borderline to low average range of intellectual ability.
As to the Flynn Effect, Dr. King testified that he believed that even Dr. Flynn’s article, that promoted the down-scoring of the IQ tests, only applied this factor to capital cases in order to avoid execution. (R. 270.) Dr. King opined that there were many problems with Dr. Flynn’s methodology and further opined that the Flynn Effect was merely a theory rather than a fact.
On cross-examination, Dr. King testified that he did not believe that the WAIS-IV test was more accurate than the WAIS-III; rather, it was “just the most recent test.” (R. 283.) The circuit court determined that Smith would be given 30 days following the hearing to meet with Dr. Van Rosen to be administered the WAIS-IV test and to file a brief.
*1119 On December 11, 2008, Smith withdrew his request for further testing by Dr. Van Rosen. Smith filed a brief supporting his claims presented in the hearing on March 6, 2009, and four days later, the State filed its brief in opposition. Following Smith’s response to the State’s memorandum brief, and after acknowledging the law as to this issue as well as the relevant and conflicting evidence, the circuit court issued an order regarding Smith’s claim of mental retardation, to which the court noted the majority of the evidence at the hearing had related. The court found as follows:
“Mr. Smith stated as follows in a pretrial conversation that he did not know was being recorded:
“T thought somebody saw me back there, I waited for a day. I said if nobody find that car today that mean ain’t too much looking for her. So what I do, I’ll go round there and bum that bitch up, get my fingerprints off of it. So that’s what I did. I burned that bitch slap off, I burned that bitch so bad that the car seat, you know a little- I/A [inaudible] heart-I threw the keys away in the ... I threw the keys away in the ... I/A ... and I wiped the car off with some gas, you understand what I’m saying?’
“(RT. 220, 221.)
“In the same statement [Smith] also acknowledged his understanding that he may be caught if he failed to kill the victim, in part because she was a police officer’s sister, when he stated as follows: ‘She didn’t know [he would kill her], she just said here you can take the car. I was acting like this here. I was thinking don’t shoot, don’t do it. Her brother a police. No if I let you go you going to fuck me up.... She said. No I’m not. I promise, (mimicking a female voice). I said you a liar, boom, Then shot her in the head with that gun.’ (CT. 219.) In this Court’s opinion, [Smith’s] intentional killing of the victim, based in part upon his realization that the victim’s relationship to a police officer would make his capture more likely, and his apparently well thought-out attempt to cover up the crime, weighs against [Smith] in relation to the adaptive functioning requirement. This conclusion is supported by the opinion in Ferguson v. State, [13 So.3d 418 (Ala.Crim.App.2008) ], indicating that extensive involvement in crime and post-crime planning are factors to consider.
“After considering the expert testimony of all witnesses, this Court summarizes the testimony as follows and reaches the following conclusions: Dr. Salekin’s test results indicate that [Smith’s] lowest adaptive functioning scores were in the area of motor skills and his highest scores were associated with his community living skills. It appears that the SB-R test, as conducted with [Smith’s] brother, placed [Smith] at an overall skill level of 12 years and 8 months. Yet, the test conducted with [Smith’s] mother placed him at a skill level of 15 years 3 months. Even Dr. Salekin indicated that the large difference between the two tests scores was significant. In this Court’s opinion, such a difference detracts from the significance placed on the test results. The Court also notes the high likelihood of inaccuracy in [Smith’s] primary SB-R test which was based upon answers of [Smith’s] ‘younger brother.’ At best, [Smith’s] younger brother was in his middle teens when the events that he was questioned about occurred, and he was trying to remember [Smith’s] skill level approximately 30 years earlier. When Dr. Salekin [did the] Woodcock-Johnson Achievement Te[st] levels included below average scores, but not significantly substandard scores in the *1120 categories of speech, communication, listening comprehension, reading, math, and written skills. Dr. Salekin testified that [Smith’s] math and spelling skills were at the level of a high school senior or college participant. In Dr. Salekin’s opinion, Smith’s high math, oral language, writing, spelling and oral comprehension scores were inconsistent with a finding that Smith is mildly mentally retarded. Dr. Salekin also testified that adaptive functioning tests would be affected by an individual’s use of drugs or alcohol. The record from interviews done by Dr. Blotcky and Dr. Rosecrans prior to [Smith’s] trial indicates that [Smith] used alcohol and drugs on a regular basis; therefore, some deficits in his adaptive functioning, even at age 17, could be attributed to his drug use.
“Although evidence is clear [Smith] has below average intelligence which has, in some ways, probably affected his life style, [Smith] has failed to meet the burden of proving that he is mentally retarded so as to preclude imposition of the death penalty. Although the undersigned is of the opinion that a court is not bound to follow an expert’s opinion as to whether or not an individual meets the Atkins criteria, the lack of any testimony that Willie Smith is mildly mentally retarded is a strong contributing factor in the Court’s decision as it relates to this issue. Furthermore, this Court is of the opinion that [Smith] is incorrect in asserting that Rule 704, Alabama Rules of Evidence, precludes testimony from the experts regarding their opinion as to whether or not [Smith] is mentally retarded. First, the commentary to Rule 704 notes that this rule ‘has been little enforced.’ Furthermore, the appellate courts of Alabama has held ‘ “ ‘ “that expert testimony as to the ultimate issue should be allowed when it would aid or assist the trier of fact, and the fact that ‘ “ ‘a question propounded to an expert witness will illicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper’ ” ’ (citations omitted); see also Rule 702, Ala. R. Evid. (stating that expert testimony should be allowed when it will aid or assist the trier of fact.” ’ ” ’ Kennedy v. State, 929 So.2d 515, 519 (Ala.Crim.App.2005) (citations omitted). Based upon the foregoing, this Court is of the opinion that it was proper for either side to illicit testimony as to a qualified expert’s opinion about whether [Smith] was mentally retarded. Furthermore, that testimony was relevant to the ultimate issue of whether the test outlined in Atkins v. Virginia, Ex parte Perkins, [851 So.2d 453 (Ala.2002) and their progeny was met.”
(C. 70-71.) Thus, the court determined that Smith failed to meet his burden of proving that his “limitations” were “‘significant’ enough” to meet the requirements of proving mental retardation. (C. 72.)
As to Smith’s claim that he was denied a fair trial and the effective assistance of counsel because he was under the influence of Haldol during trial, the court found that his claim that he had been denied his right to a fair trial was precluded. Specifically, the court determined that this issue could have been, but was not, raised at trial or on appeal. Rule 32.2(a)(3) and (5), Ala. R.Crim. P. Similarly, the court found, to the extent Smith contended that the State had violated his rights to due process by administering Haldol to him, that the claim was precluded. However, the court opined that his claim of ineffective assistance of counsel based on this claim was not precluded.
The court also addressed Smith’s claim that his counsel was ineffective for failing *1121 to object to the prosecutorial comments concerning his lack of remorse and that this failure was compounded because his counsel did not know that he had been taking Haldol. The court stated in its order that, because there was no indication that Smith informed either of his counsel that he was taking Haldol or any other medication, nor was there evidence that either doctor who had examined him before trial noted any difficulty attributable to the possible use of Haldol, his counsel had not performed ineffectively under the first prong of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
As to Smith’s claim that lethal injection violates the Eighth Amendment because it constitutes cruel and unusual punishment, the court determined this claim to be insufficiently pleaded and to lack merit, citing Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). The court also found as insufficiently pleaded and proved Smith’s claim that the State failed to disclose a letter concerning his suicide attempt and hallucinations, because the letter was not produced or discussed at the hearing and the date of its discovery was not pleaded.[6] Although Smith argued that the State improperly bolstered the testimony of a State’s witness, the court stated that this issue was previously raised on appeal and this Court determined that the issue lacked merit. Therefore, the court held that the issue was precluded under Rule 32.2(a)(4), Ala.R.Crim.P.[7], and lacked merit. Similarly, Smith contends that the admission of certain evidence, a wristwatch and a ring, was improper due to a faulty chain of custody; however, the court found that this matter was previously raised on direct appeal. Rule 32.2(a)(4). This Court has found no plain error as to this matter; also, it was not raised at trial. Rule 32.2(a)(3), Ala.R.Crim.P. Smith v. State, 838 So.2d at 449.
Smith’s claim, that his rights to be protected against double jeopardy were violated because he was convicted of two counts of capital murder and was sentenced to death, was previously addressed and determined to lack merit by this Court. See Smith v. State, 838 So.2d at 469. Therefore, the circuit court determined that, although jurisdictional, it was precluded as having previously been addressed and resolved. Rule 32.2(a)(3).[8] Moreover, “double counting” is permissible. See, e.g., Whatley v. State, [Ms. CR-08-0696, December 16, 2011] — So.3d -, - (Ala.Crim.App.2011); Brown v. State, 74 So.3d 984, 1034-35 (Ala.Crim.App.2010); Brooks v. State, 973 So.2d 380, 415 (Ala.Crim.App.2007).
As to Smith’s claim that he received an unfair trial as a result of the prejudicial atmosphere in the community, the circuit court stated in its order that this claim was precluded because it could have been raised at trial and it was raised on appeal. Rule 32.2(a)(3) and (4). See Smith v. State, 838 So.2d at 469-71. Moreover, the court found this issue to lack merit. Smith’s claim concerning the improper admission of prejudicial photographs was also found to be precluded because he raised this issue both at trial and on appeal. Rule 32.2(a)(2) and (4).
*1122 Smith had argued in his petition that the trial court improperly considered during sentencing, evidence that was not presented to the jury. He specifically referred to the reports by Dr. Rosecrans and Dr. Blotcky that the trial court had noted in determining that a mitigating factor, specifically that the offense was committed while Smith was under the influence of extreme mental or emotional distress, did not exist. As to this contention, the circuit court stated that the argument was based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and, without ruling as to whether it was precluded, the court determined that the argument lacked merit. The court stated that the mention of these reports did not affect the trial court’s finding that Smith had presented no evidence of this mitigating circumstance during the guilt or penalty phases. The circuit court also acknowledged that, on direct appeal, this Court held in a related issue that the trial court’s mention of these reports was not prejudicial to Smith and did not constitute to plain error. See Smith v. State, 838 So.2d at 443-444.
As to Smith’s claim that his right to counsel was violated when the State obtained his statement made post-arrest to a police informant, this issue was raised at trial and on appeal. Rule 32.2(a)(2) and (4). See Smith v. State, 838 So.2d at 462. Smith also contended that the State violated a discovery order as to this statement and improperly withheld it until the day of trial; however, the circuit court determined that this issue had also been raised at trial and on appeal. Rule 32.2(a)(2) and (4). Smith v. State, 838 So.2d at 439-42. Moreover, the court stated in its order that, as this issue relates to other exculpatory statements by Smith, those claims could have been, but were not, raised at trial or on appeal. Rule 32.2(a)(3) and (5).
As to Smith’s claims of errors by the trial court during both phases of trial, the circuit court found these claims to be precluded. Specifically, Smith’s claims that the trial court erred in failing to recuse and failing to conduct a competency hearing were neither raised at trial or on appeal. Rule 32.2(a)(3) and (5). Moreover, the circuit court found the following claims to be precluded because they could have been raised at trial and were raised on direct appeal: the giving of allegedly improper jury instructions during both phases, commenting on Smith’s failure to testify, refusing to answer a juror’s question, allowing the jury to be exposed to allegedly inadmissible evidence, and improperly considering a pretrial psychiatric examination. Rule 32.2(3) and (4). Finally, the circuit court determined that the following issues were raised both at trial and on appeal: improperly limiting the cross-examination of certain State’s witnesses, refusing to allow Smith to use a juror questionnaire, refusing to strike a potential juror, and denying Smith’s motion for change of venue. Rule 32.2(a)(2) and (4).
The circuit court further addressed each of the ineffective-assistance-of-counsel claims raised by Smith in his petition. The circuit court deemed a number of these claims to have been abandoned or to have been insufficiently pleaded in the petition and/or proved, because Smith did not provide any evidence or specific factual basis to support them in his petition or at the hearing. These claims included claims that his counsel was inadequate for failing to contact him in order to develop a strategy; that his counsel failed to call a witness who had had contact with Smith on the day of the offense; that his counsel failed to investigate whether someone else was the triggerman; that his counsel failed to adequately investigate his long-time sub *1123 stance abuse so as to negate the element of intent;[9] that his counsel failed to allow him to testify, although he wished to rebut the testimony of certain State’s witnesses; that his counsel’s failure to request the trial judge to recuse himself because the judge allegedly[10] made a pretrial statement that he would sentence Smith to death if he did not accept a plea offer; that his counsel failed to life-qualify the jury and to request the jury to state if it could consider, or reasons it could not consider, a life-imprisonment sentence;[11] that his counsel failed to object to allegedly improper prosecutorial conduct;[12] that his counsel failed to hire a qualified expert in Dr. Bloteky and did not sufficiently prepare or question him or hire him in a timely manner; that his counsel failed to call a number of character witnesses and defense witnesses[13] or to sufficiently investigate his background for mitigating evidence; that his counsel was ineffective as a result of inadequate compensation by the State for representation of indigent capital defendants; that his counsel failed to properly prepare defense witnesses to testify; that witnesses’ testimony at the penalty phase presented by his counsel conflicted; [14] and that his counsel failed to move for a competency hearing.[15]
Smith also raised a number of claims that his trial counsel failed to properly examine various items of State’s evidence. He contended and the circuit court found: that counsel should have known to object to a tape showing prior misconduct (however, the circuit court determined that the trial court had excluded evidence of the prior misconduct and this holding was upheld on appeal); that counsel could have seen an ATM tape indicating that an individual resembled Lorenzo Smith (however, the circuit court determined that Smith had failed to show how this tape could have been admitted or its relevance); and that his counsel should have objected to the chain of custody of some evidence (however, the circuit court found that this Court addressed the chain of custody as it related to two items of evidence and Smith failed to present any specific evidence as to this claim).
Smith also argued, concerning his representation during the penalty phase by his assisting counsel, that he received ineffectiveness of counsel because this counsel had only been licensed to practice for one year and yet handled the majority of his penalty phase. Moreover, his was her first criminal trial. However, the circuit *1124 court stated in its order that the lead counsel’s experience had far exceeded the statutory requirement, and he had been present throughout the penalty phase and delivered the closing argument at sentencing. Because only one counsel representing a capital defendant is required to have over five years of experience, the court determined that Smith failed, to satisfy the ineffectiveness prong of Strickland v. Washington, supra. See Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001).
Smith also contended in his petition that his trial counsel was ineffective for failing to present evidence concerning the history of the prosecutors from the Jefferson County District Attorney’s Office for engaging in discriminatory strikes against potential jurors. However, the circuit court determined that this issue lacked merit. It noted that the record on appeal, as well as the findings by this Court when it remanded the case to determine if the prosecutor had improperly removed females from the jury, indicated that the prosecutor used 14 of his 15 strikes against females. As to the 14 strikes against females, this Court determined that they were based on nondiseriminatory grounds and, as to the 15th strike, it was waged against a white male. Therefore, the circuit court found that Smith failed to show prejudice or ineffectiveness concerning his counsel’s failure to introduce any alleged evidence of a history of discriminatory striking of potential jurors by the prosecutor.
Further, the circuit court stated, as to Smith’s claim that his trial counsel was ineffective for failing to introduce the fact or to argue that he was using Haldol and how its use had affected him at trial, the circuit court found that there was no clear evidence indicating that Smith had been given Haldol and there was no evidence indicating that he had informed his counsel that he had taken medicine or that he felt affected by medicine. Nor did either of the doctors who interviewed him notify counsel of such. The court stated “defense counsel should not be regarded as ineffective for failing to know about non-obvious psychological problems that are not brought to their attention by their client.” (C. 83.)
Smith also claimed ineffective representation by his appellate counsel because, he argues, counsel should have argued differently to the Alabama Court of Criminal Appeals his claim of discriminatory strikes of potential jurors by the prosecutor. However, this Court remanded this case concerning the issue of discriminatory strikes against females and determined that the strikes were not discriminatory as to gender. This Court also determined that Smith failed to show discriminatory strikes by the prosecutor as to a Hispanic veniremember and as to the black potential jurors. The circuit court determined that this issue as to any discrimination during the striking of the jury lacked merit, and that neither trial nor appellate counsel were ineffective in raising this claim. Further, the circuit court found no prejudice to Smith on this ground. Additionally, the court found that, to the extent Smith argued as a substantive issue that the prosecutor improperly removed potential jurors from the venire in a discriminatory manner, this issue was precluded because it was raised at trial and on appeal. Rule 32.2(a)(2) and (4).
Moreover, the circuit court determined that appellate counsel was not ineffective for failing to present this issue differently to the Alabama Supreme Court because Smith did not have a right to counsel when pursuing a discretionary appeal to that Court. State v. Carruth, 21 So.3d 764 (Ala.Crim.App.2008). Thus, he could not claim ineffectiveness. Similarly, Smith’s *1125 claim that his appellate counsel failed to include several arguments in his petition for the writ of certiorari to the Alabama Supreme Court is rejected by the holding in Carruth. The circuit court further found that Smith had failed to meet his burden of showing prejudice under Strickland v. Washington on this issue.
On appeal, Smith argues: that the circuit court erred in failing to find that he is mentally retarded; that the circuit court erred in failing to find that the administration of Haldol to him at the time of trial violated his constitutional rights; that Smith’s counsel was ineffective based on four grounds; that the prosecutor improperly removed potential jurors from the venire in a discriminatory manner and did not come forward with sufficient reasons for these strikes; that Alabama’s method of execution — lethal injection — is unconstitutionally cruel and unusual punishment; and that Smith was denied due process because the jury did not determine the facts, in violation of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
I.
Smith argues that the circuit court erred in holding that he is not mentally retarded under the standards set fourth in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Ex parte Perkins, 851 So.2d 453 (Ala.2002). Specifically, he contends that the court erred in failing to find that Smith had satisfied the three-pronged test set fourth in Atkins to prove mental retardation and, by relying on expert-opinion evidence concerning clinical mental retardation, had improperly relied on evidence outside these factors.
Although the standard of proof to have been met by Smith in order to prove that he was entitled to relief because he is mentally retarded was a preponderance of the evidence, see Rule 32.3, the circuit court’s findings are reviewed for whether the court abused its discretion for denying relief. Morrow v. State, 928 So.2d 315, 323 (Ala.Crim.App.2004). “ ‘ “ ‘A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.’ ” ’ Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005) (quoting State v. Jude, 686 So.2d 528, 530 (Ala.Crim.App.1996) (quoting Dowdy v. Gilbert Eng’g Co., 372 So.2d 11, 12 (Ala.1979) (quoting Premium Service Corp. v. Sperry & Hutchinson, Co., 511 F.2d 225 (9th Cir.1975)))).” Byrd v. State, 78 So.3d 445, 450-51 (Ala.Crim.App.2009).
In Morris v. State, 60 So.3d 326, 339 (Ala.Crim.App.2010), this Court addressed the legal definition of mental retardation in Alabama, which is to be applied in determining whether a capital defendant should be executed, and stated:
“The United States Supreme Court in Atkins provided guidelines for determining whether a person is mentally retarded to the extent that he or she should not be executed. However, the Court also held that ultimately the states should establish their own definitions. The Court stated:
“ ‘To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national con *1126 sensus. As was our approach in Ford v. Wainwright, 477 U.S. 399 (1986), with regard to insanity, “we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.” Id., at 405, 416-417.’
“536 U.S. at 317, 122 S.Ct. at 2250. (Footnote omitted.)
“Alabama has yet to statutorily define mental retardation in the context of determining the sufficiency of an Atkins claim. However, Alabama has defined a mentally retarded person for the purposes of the ‘Retarded Defendant Act,’ § 15-24-1 et seq., Ala.Code 1975, as follows:
“ ‘Mentally retarded person. A person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.’
“ § 15-24-2(3), Ala.Code 1975.
“The Alabama Supreme Court has directed that review of Atkins claims are to be conducted applying the ‘ “most common” or “broadest” definition of mental retardation, as represented by the clinical definitions considered in Atkins and the definitions set forth in the statutes of other states that prohibit the imposition of the death sentence when the defendant is mentally retarded. See, e.g., Ex parte Perkins, 851 So.2d 453, 455-56 (Ala.2002).’ Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d -, - (Ala.2007). Moreover, in examining the definitions of mental retardation in other states with statutes prohibiting the execution of a mentally retarded person, the Alabama Supreme Court has written:
“ ‘Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).’
“Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002).[3]
“Similarly, in suggesting guidance for determining whether a defendant is mentally retarded so as to prohibit the defendant’s execution, the Atkins Court discussed clinical definitions of mental retardation and concluded that these definitions ‘require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.’ 536 U.S. at 318, 122 S.Ct. 2242. Further, ‘[i]mplicit in the definition is that the subaverage intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18.’ Smith v. State, — So.3d at -.
“Alabama appellate courts have determined that until the Alabama Legislature establishes a definition for mental retardation to be used in determining Atkins claims, Alabama courts will continue to review such claims ‘on a case-by-case basis and to apply the guidelines that have been judicially developed thus far.’ Morrow v. State, 928 So.2d 315, 324 (Ala.Crim.App.2004).
*1127 “The burden of proof for a claim that a capital defendant is mentally retarded and therefore may not constitutionally be executed is on the defendant, and he or she must prove this claim by a preponderance of the evidence. Cf. Trawick v. State, 698 So.2d 151 (Ala.Crim.App.1995) (overruling Bass v. State, 585 So.2d 225 (Ala.Crim.App.1991), to the extent it implied that the burden of proving an insanity defense was by a ‘preponderance of the evidence’ rather than by ‘clear and convincing evidence’).
“ ‘ “In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded.” Smith v. State, [Ms. 1060427, May 25, 2007] — So.3d at -; see Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009] — So.3d - at - (Ala.Crim.App.2007) (opinion on return to fourth remand). “ ‘The question of [whether a capital defendant is mentally retarded] is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony of that issue.’ ” Smith v. State, [Ms. CR-97-1258, Jan. 16, 2009] — So.3d at - (quoting Atkins v. Commonwealth, [266 Va. 73,] 581 S.E.2d 514, 515 (2003)). As the Alabama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, “which [have] the opportunity to personally observe the witnesses and assess their credibility.” Smith v. State, [Ms. 1060427, May 25, 2007] - So.3d at - (quoting Smith v. State, [Ms. CR-97-1258, Sept. 29, 2006] — So.3d -, - (Ala.Crim.App.2006) (Shaw, J., dissenting) (opinion on return to third remand)).’
“Byrd v. State, [78 So.3d at 450]. See also Jenkins v. State, 972 So.2d 165, 167 (Ala.Crim.App.2005) (‘ “Preponderance of the evidence” is defined as: “The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.” Black’s Law Dictionary 1220 (8th ed.2004).’).
Morris v. State, 60 So.3d 326, 339-41 (Ala.Crim.App.2010).
In this case, Smith was afforded a hearing at which he could attempt to prove by a preponderance of the evidence that he was mentally retarded under Atkins. Expert testimony and evaluations were presented as to Smith’s mental condition. Following this hearing, the parties were allowed to submit briefs, and the court thereafter made the following findings, in pertinent part, as to Smith’s claim of mental retardation:
“[Smith’s] failure to present an expert who believes [Smith] is mentally retarded does not preclude relief. Yet, ... the lack of such expert testimony weighs against [Smith].
“There was conflicting testimony by experts as it relates to the first factor of whether [Smith] has ‘significantly sub-average intellectual functioning’. Dr. Karen Salekin, who was called by [Smith], testified [Smith] had an overall *1128 IQ of 64. Dr. Salekin testified that [Smith] had [‘]a full scale intelligence quota of 64 with a 95 confidence interval of 61 to 69.’ (R. 69). Although Dr. Salekin also testified that the ‘Flynn Effect could lower [Smith’s] IQ test score by more than two points’, this Court did not find evidence regarding the Flynn Effect to be convincing enough so as to warrant a reduction of Salekin’s or Dr. King’s Intelligence Quotient test results. Even Dr. Salekin agreed that there is ‘no [national consensus]’ on whether the Flynn Effect should be applied to IQ scores. (R. 87). Dr. Glenn King, who testified for the [State], stated that [Smith] had a verbal IQ of 75 and a performance IQ level 74, which resulted in full scale IQ of 72. The Court found both of these experts to be credible with an appropriate background to testify regarding the Intelligence Quotient tests. Based in part upon Dr. King’s verbal IQ score calculation of 75 and this score’s exact correlation with Dr. Blotcky’s determination that Willie Smith also had a verbal IQ of 75, this Court was of the opinion that Dr. King’s overall IQ calculation for Willie Smith was probably more accurate than that determined by Dr. Salekin.
“As it relates to [Smith’s] adaptive functioning, areas to be considered include ‘communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.’ Atkins v. Virginia, 536 U.S. 304, 309 122 S.Ct. 2242, 2245 (2002). Although [Smith] showed deficits in adaptive functioning based upon test results, [Smith] did not show many, if any, actual examples of how his low IQ affected his adaptive functioning in everyday life before or after the incident in question....
“One of the ‘drawbacks’ to the SIB-R test is the individual’s ability to remember past events, and Dr. Salekin agreed that the tests administered to [Smith’s] brother involved questions about behavior approximately 30 years prior to the test. Ideally one would want to administer the SIB-R test at the time in question rather than many years later because that is how the ‘test was normed.’ (R. 90). On the SIB-R, Smith’s ‘personal living skills indicated an age equivalency of 12 years, 8 months.’ (R. 89, 90). “Dr. Salekin also administered the ‘Woodcock Johnson III test to determine current achievement levels, which relates directly to school function.’ ... Over an objection by counsel [for] [Smith], Dr. Salekin testified that she does not believe Smith has mental retardation. She reached this conclusion after doing ‘a full Atkins evaluation.’ (R. 106,107).
“[Smith] also called Dr. Daniel Marson, a clinical neuropsychologist employed in the Department of Neurology at the University of Alabama at Birmingham ....
“In general, this Court would summarize Dr. Marson’s testimony as indicating that [Smith’s] deficits would cause him some difficulty in following instructions and retaining information so as to cause some shortcomings as it relates to school or work activities. Yet, Dr. Marson did not indicate that [Smith’s] shortcomings would cause him to be unable to succeed in school, work, of society in general, but it might require additional effort or instruction for Smith to perform on par with his peers. Dr. Marson did not express an opinion as to whether [Smith] was mildly mentally retarded.
“The State then called Dr. Glen David King, a clinical and forensic psychologist, to testify. According to Dr. King, on the Wechsler Adult Intelligence Scale, Third Edition, [Smith] generated *1129 a verbal IQ of 75, a performance IQ level of 74, and a full scale IQ of 72. Dr. King also did the WRAT-4 test which ‘gives an indication of an individual’s ability to read, write, and do arithmetic.’ With the average score being 100, the Defendant scored an 85 on reading, 93 on spelling, and 84 on math computation. These test scores equate to grade levels as follows: reading equated to 8.6 grade level, spelling to a 11.5 grade level, and math to a 6.3 grade. (R. 240-242). Dr. King then administered the Adaptive Behavior Assessment System, Second Edition (ABAS-2), test to measure the Defendant’s adaptive functioning. He also administered the Minnesota Multi-phasic Personality Inventory (MMPI-2) test to determine whether Smith showed psychotic symptoms, anxiety symptoms or depression. (R. 245, 246). On the MMPI test the profile was invalid because it showed that Smith either ‘purposefully attempted to look like he was having a mental illness on this particular instrument or he randomly sorted items.’ (R. 248). Dr. King also did an interview with Mr. Smith, and Smith did not have any difficulties in communication or understanding questions or administration of the tests. Over the Petitioner’s objection. Dr. King testified that in his opinion ‘Mr. Smith is not mentally retarded and that he likely functions somewhere in the high borderline to low average range of intellectual ability.’ (R. 251)_
“In addition to the testimony from the Rule 32 evidentiary hearing, this Court found certain portions of the trial transcript to be relevant to this issue, in particular, [Smith’s] father did not help take care of him and his mother frequently worked; therefore, after age 8 or 9 Willie Smith and siblings ‘practically raised themselves.’ According to [Smith’s] mother, it appears that Smith took care of the other children while she was gone. (R. 1474.) [Smith] dropped out of school in the 10th grade so that he could work and help provide for his family. (R. 1479.) According to Mrs. Smith, [Smith] provided well for her. (R. 1480.) He kept a job at Birmingham Stove and Range for 2 years then got another job at Coca-Cola Company, but he was ‘relieved’ from his job at Coca-Cola when he ‘got on dope’ and missed some work. (R. 1659.) As noted in Ferguson v. State, [13 So.3d 418 (Ala.Crim.App.2008) ], [Smith’s] ability to work and support his family, even at a young age, weighs against [Smith] in his argument that he is mentally retarded. Furthermore, Dr. Blotcky testified that he found ‘no diminished capacity’ when he met with [Smith]. (R. 1504.)
“Other testimony or evidence from [Smith’s] trial which is relevant to the question of whether Smith had insufficient adaptive functioning came from a conversation with [Smith] which was admitted to evidence during the trial. In particular, Mr. Smith stated as follows in a pretrial conversation that he did not know was being recorded: T thought somebody saw me back there, I waited for a day. I said if nobody find that car today that mean ain’t too much looking for her. So what I do, I’ll go round there and bum that bitch up, get my fingerprints off of it. So that’s what I did. I burned that bitch slap off, I burned that bitch so bad that the car seat, you know a little.... I/A [inaudible] heart... I threw the keys away in the ... I threw the keys away in the ... I/A ... and I wiped the car off with some gas, you understand what I’m saying?’ (RT. 220, 221.)
“In the same statement [Smith] also acknowledged his understanding that he may be caught if he failed to kill the *1130 victim, in part because she was a police officer’s sister, when he stated as follows: ‘She didn’t know [he would kill her], she just said here you can take the car. I was acting like this here. I was thinking don’t shoot, don’t do it. Her brother a police. No if I let you go you going to fuck me up.... She said. No I’m not. I promise, (mimicking a female voice). I said you a liar, boom, Then shot her in the head with that gun.’ (CT. 219.) In this Court’s opinion, [Smith’s] intentional killing of the victim, based in part upon his realization that the victim’s relationship to a police officer would make his capture more likely, and his apparently well thought-out attempt to cover up the crime, weighs against [Smith] in relation to the adaptive functioning requirement. This conclusion is supported by the opinion in Ferguson v. State, supra, indicating that extensive involvement in crime and post-crime planning are factors to consider.
[[Image here]]
“Although evidence is clear [Smith] has below average intelligence which has, in some ways, probably affected his life style, the Petitioner has failed to meet the burden of proving that he is mentally retarded so as to preclude imposition of the death penalty....
“Based upon the testimony presented at the Rule 32 hearing, relevant portions of the trial transcript, and other matters outlined herein, this Court finds that [Smith] has failed to establish that he is mentally retarded so as to preclude him from receiving a death sentence in this case. Two experts expressly stated that in their opinion Willie Smith was not mentally retarded, and the other experts who testified did not refute those opinions. The record indicates that Willie Smith properly functioned in society prior to his arrest for the offense in question. Although testimony was presented regarding possible deficiencies in [Smith’s] adaptive functioning based upon tests results, there was no testimony regarding deficiencies in [Smith’s] actual ability in areas such as ‘communication, self care, home living, social interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety.’ Ferguson v. State, [13 So.3d 418] (Ala.Crim.App.2008). In numerous test categories the Defendant tested in the average range or above average, and those test scores were inconsistent with a finding that [Smith] was mentally retarded.
“Based upon the foregoing, this Court finds that [Smith] has failed to meet the burden of proving that he is mentally retarded so as to preclude opposition of the death sentence that was imposed in this case. This Court finds that [Smith’s] limitations are not ‘significant’ enough to meet the requirements previously outlined herein.”
(C. 65-72.)
As the circuit court found and as the evidence at the hearing established, Smith did not prove by a preponderance of the evidence that he was mentally retarded. The greater weight of the evidence indicated that, although he suffered with some mental deficiencies, they did not rise to the level at which an impartial mind would conclude from the evidence that he was mentally retarded.
A.
Smith did not show that he suffered from subaverage intellectual functioning. Despite his argument that the testimony by Dr. Salekin concerning the Flynn Effect showed that his IQ was actually lower than the test results indicated, the circuit *1131 court found that the evidence was unconvincing. On cross-examination of Dr. Sale-kin, she admitted that the Stanford-Binet test and the WAIS-III test did not refer to the Flynn Effect or the need to adjust the test scores. The Diagnostic and Statistics Manual 4 TR, which was likened to the Physicians’ Desk Reference also did not recommend adjusting IQ scores for the Flynn Effect.
Moreover, this Court has previously held on several occasions that a trial court need not accept the “Flynn Effect” as binding, and that it has not been accepted as scientifically valid by all courts. See Albarran v. State, 96 So.3d 131, 200 (Ala.Crim.App.2011) (“Although Dr. Weinstein also testified that, when adjusted for the ‘Flynn effect,’ Albarran’s IQ was around 68, the circuit court could have reasonably rejected the ‘Flynn effect’ and determined that Albarran’s IQ was 71. Gray v. Epps, 616 F.3d 436, 446 n. 9 (5th Cir.2010) (quoting In re Mathis, 483 F.3d 395, 398 n. 1 (5th Cir.2007) (‘[T]he Flynn Effect “has not been accepted in this Circuit as scientifically valid.” ’)); Bowling v. Commonwealth, 163 S.W.3d 361, 375 (Ky.2005) (holding that ‘Atkins did not discuss margins of error or the “Flynn effect” and held that the definition [of mental retardation] in KRS 532.130(2) “generally con-formad]” to the approved clinical definitions’ so the court could not consider the Flynn effect); Thomas v. Allen, 607 F.3d 749, 758 (11th Cir.2010) (‘[T]here is no uniform consensus regarding the application of the Flynn effect in determining a capital offender’s intellectual functioning, and there is no Alabama precedent specifically discounting a court’s application of the Flynn effect.... ’).”)(Footnote omitted.)
“The United States Court of Appeals for the Eleventh Circuit has stated:
“ ‘[A]ll the experts acknowledged that the Flynn effect is a statistically-proven phenomenon, although no medical association recognizes its validity. Numerous courts recognize the Flynn effect. See e.g., Walker v. True, 399 F.3d 315, 322-23 (4th Cir.2005) (stating that on remand, the district court should consider the Flynn effect evidence to determine if petitioner’s IQ score is overstated); United States v. Davis, 611 F.Supp.2d 472, 486-88 (D.Md.2009) (district court considered Flynn effect in evaluation of defendant’s intellectual functioning); People v. Superior Court, 28 Cal.Rptr.3d 529, 558-59 (Cal.Ct.App.2005), overruled on other grounds by 40 Cal.4th 999, 56 Cal.Rptr.3d 851, 155 P.3d 259 (2007) (recognizing that Flynn effect must be considered); State v. Burke, No. 04AP-1234 ... (Ohio Ct.App. Dec. 30, 2005) [(not reported in N.E.2d)] (stating that court must consider evidence on Flynn effect, but it is within court’s discretion whether to include it as a factor in the IQ score). There are also courts that do not recognize the Flynn effect. See In re Mathis, 483 F.3d 395, 398 n. 1 (5th Cir.2007) (noting that circuit has not recognized Flynn effect as scientifically valid); Berry v. Epps, No. 1:04CV328-D-D ... (N.D.Miss. Oct. 5, 2006) [ (not reported in F.Supp.2d) ] (refusing to consider Flynn effect); Bowling v. Commonwealth, 163 S.W.3d 361, 374-75 (Ky.2005) (noting that because Kentucky statute unambiguously sets IQ score of 70 as cutoff, courts cannot consider Flynn effect or SEM [standard error of measurement]).’
“Thomas v. Allen, 607 F.3d 749, 757 (11th Cir.2010). See. also Nava Feldman, Application of Constitutional Rule of Atkins v. Virginia, 536 U.S. 304, 122 *1132 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that Execution of Mentally Retarded Persons Constitutes ‘Cruel and Unusual Punishment’ in Violation of Eighth Amendment, 122 A.L.R.5& 145 (2004).”
Daniel v. State, 86 So.3d 405, 433 (Ala.Crim.App.2011). Thus, the circuit court did not err in failing to find that Smith’s IQ scores should be lowered pursuant to the Flynn Effect.
Similarly, Smith contends that the court should have applied the standard measurement of error, referring to the testimony by Dr. King that IQ scores are typically reported in a range of plus or minus five points, to its findings concerning his scores. However, this Court has refrained from adopting a margin of error as it would apply to IQ scores, because doing so would expand the definition of mentally retarded established by the Alabama Supreme Court in Ex parte Perkins. In Smith v. State, 71 So.3d 12 (Ala.Crim.App.2008), this Court stated:
“Smith urges this Court to adopt a ‘margin of error’ when examining a defendant’s IQ score and then to apply that margin of error to conclude that because Smith’s IQ was 72 he is mentally retarded. The Alabama Supreme Court in Perkins did not adopt any ‘margin of error’ when examining a defendant’s IQ score. If this Court were to adopt a ‘margin of error’ it would, in essence, be expanding the definition of mentally retarded adopted by the Alabama Supreme Court in Perkins. This Court is bound by the decisions of the Alabama Supreme Court. See § 12-3-16, Ala. Code 1975. As one court noted concerning the margin of error in IQ tests as it related to a federal regulation:
“ ‘We find the reasoning in Bendt [v. Chater, 940 F.Supp. 1427 (S.D.Iowa 1996)], and its reliance on Cockerham v. Sullivan, 895 F.2d 492, 495 (8th Cir.1990), to be most persuasive. Ellison v. Sullivan, 929 F.2d 534 (10th Cir.1990). In Bendt, the district court noted that “incorporating a 5 point measurement error into a claimant’s IQ test results would effectively expand the requisite IQ under listing 12.05(C) from test scores of 60 to 70 to test scores of 60 to 75.” Bendt, 940 F.Supp. at 1431. The Court concluded that this would alter the range of IQ’s which satisfy the Listing of Impairments for Mental Retardation and Autism in contradiction of the federal regulations interpreting the Act.’
“Colavito v. Apfel, 75 F.Supp.2d 385, 403 (E.D.Pa.1999).”
71 So.3d at 20-21.
B.
Although there was some evidence of deficiencies in Smith’s adaptive behavior, these deficiencies were not significant in relation to all his testing concerning this prong of the Atkins test. Moreover, other than statements by his family, there was no indication that Smith had been unable to function in society prior to the offense. Smith, however, argues that because at least two of the number of categories addressed by his adaptive-functioning tests indicated that he lacked the ability to function in the normal skills area, the trial court should have found that he met this prong. He argues that, in order to prove a lack of adaptive behavior under Atkins, a defendant need only be deficient in two areas. He argues that the determination as to deficiency in adaptive functioning does not involve a balancing test.
However, as noted by the State in its brief on appeal, the Alabama Supreme Court in Ex parte Perkins looked to evidence presented at trial of factors in Perkins’s life in determining his adaptive be *1133 havior, aside from his test results. The Court stated:
“Additionally, the evidence presented at trial indicates that Perkins did not exhibit ‘significant’ or ‘substantial’ deficits in adaptive behavior before or after age 18. Perkins was able to have interpersonal relationships. Indeed, he was married for 10 years. He maintained a job as an electrician for a short period.”
851 So.2d at 456. See also Stallworth v. State, 868 So.2d 1128, 1182 (Ala.Crim.App.2001) (although Stallworth’s scores qualified him for special-education classes, as well as vocational-rehabilitation services, he was not found to be mentally retarded and, as to his adaptive behavior, this Court considered that he had “maintained a job for most of his adult life; he has worked as a cook, a brick mason, and a landscaper. Stallworth also has had a long-term relationship and is the father of a daughter who was four months old at the time of the murders. At the time of trial Stallworth was unemployed, but he had qualified for food stamps. There is absolutely no evidence indicating that Stallworth could not function in society....”).
Thus, although it is true that as a threshold matter the psychological evaluator must determine that the defendant was deficient in at least two areas of adaptive behavior, these shortcomings are not evaluated in a vacuum. See Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir.2009) (“According to literature in the field, significant or substantial deficits in adaptive behavior are defined as ‘concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.’ American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed.1994).”). Even where there are indications of shortfalls in adaptive behavior, other relevant evidence may weigh against an overall finding of deficiency in this area. See Lewis v. State, 889 So.2d 623, 698 (Ala.Crim.App.2003) (“Although the record indicates that Lewis had poor grades in school, was in ‘special classes’ for most of his education, and had behavioral problems beginning at age three, it appears that his childhood problems were not related to his intellectual functioning, but, rather, were precursors to his subsequent diagnosis of personality disorder with delusional features. In addition, there is nothing in the record indicating that Lewis had a history of mental retardation, and Lewis did not make his IQ an issue at trial or present any evidence during either the guilt phase or the sentencing phase of the trial indicating that he was mentally retarded. Furthermore, the nature and circumstances surrounding the crimes in this ease — including Lewis’s articulate and detailed statement to the police — suggest goal-directed behavior, thus indicating that Lewis does not suffer from deficits in adaptive behavior.”).
C.
Smith also contends that the circuit court improperly relied upon the clinical opinions of Dr. Salekin and Dr. King that he was not mentally retarded. He contends that Perkins does not require expert opinions and that, therefore, the circuit court’s consideration of this testimony and the court’s statement that the lack of expert testimony to the contrary weighed against him were misplaced. In conjunction with this argument, Smith alleges that the experts were improperly allowed to testify as to the ultimate issue in conflict with Rule 704, Ala. R. Evid.
*1134 However, testimony from a clinical psychologist is admissible in evaluating mental retardation in capital cases. See, e.g., Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002) (“The record establishes that Dr. John Goff, a licensed clinical neuropsy-chologist and clinical psychologist, testified on Perkins’s behalf ...; he did not conclude that Perkins was mentally retarded. We find Dr. Goffs diagnosis pivotal in light of the fact that, when the penalty phase of Perkins’s trial was conducted, Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and its progeny were applicable, and evidence of mental retardation established a strong mitigating circumstance to be considered in determining the appropriate sentence.” (footnote omitted)); Ray v. State, 80 So.3d 965, 981 (Ala.Crim.App.2011) (“Dr. Glen King, a clinical and forensic psychologist^] ... testified that ... [i]t was his opinion that Ray is not mentally retarded and that Ray ‘was not suffering from any serious mental illness or mental defect at the time of the offense’ or now.”). See also Borden v. State, 60 So.3d 935, 938 (Ala.Crim.App.2004), reversed on other grounds, 60 So.3d 940 (Ala.2007)(in which Dr. King’s opinion that Borden was moderately mentally retarded was considered in reversing Borden’s sentence of death).
Moreover, an expert may testify as to mental deficiency or illness in Alabama as an exception to the ultimate-issue rule. See §§ 127.02(1) and 128.04, C. Gamble, McElroy’s Alabama Evidence (6th ed.2009). There is no violation of the prohibition against testimony concerning the ultimate issue where a physician testifies concerning his opinion as to a diagnosis, including a mental diagnosis. “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.” Rule 702(a), Ala. R. Evid. See J. Colquitt, Alabama Law of Evidence (1990) (noting that lay and expert opinion evidence is allowed on certain issues, including mental condition, regardless of whether such opinion evidence goes to an ultimate issue in a case). Thus, Dr. Salekin’s and Dr. King’s opinions that Smith was not mentally retarded did not violate the rule prohibiting testimony as to the ultimate issue.
D.
Smith also argues that Dr. King’s test results should have been excluded because, he says, the State violated the court’s discovery order by not producing these test results in a timely manner. As noted by the State, although Smith has attached a copy of the discovery order to his brief, it is not contained in the record.[16] “The record on appeal cannot be enlarged or supplemented by an appendix to the appellant’s brief....” Jenkins v. State, 516 So.2d 944, 945 (Ala.Crim.App.1987), citing Tyus v. State, 347 So.2d 1377, 1380 (Ala.Crim.App.), cert. denied, Ex parte Tyus, 347 So.2d 1384 (Ala.1977).
“As a corollary, we are not permitted to consider matters ‘dehors the record.’ Cooper v. Adams, 295 Ala. 58, 61, 322 So.2d 706, 708 (1975). This rule may be restated as follows: ‘(1) Argument in brief reciting matters not disclosed by the record cannot be considered on appeal. (2) The record cannot be impeached on appeal by statements in brief, by affidavits, or by other evidence not appearing in the record.’ Id.”
Etherton v. City of Homewood, 700 So.2d 1374, 1378 (Ala.1997). The record reveals *1135 that, when the State sought to question Dr. King at the evidentiary hearing concerning his testing and evaluation of Smith, defense counsel objected, stating that the order required the State to permit the defense to copy and to inspect any reports and results of testing done pursuant to mental examinations. Defense counsel argued that
“only last Friday did the State provide to us a copy of what is believed to be a report as well as Dr. King’s notes and raw data. And based on the Court’s order for discovery that was not complied with by the State, we move to exclude Dr. King’s report, his testimony relating to that report, as well as his notes and raw data.”
(R. 245.) The prosecutor responded that the defense had known for months that Dr. King had evaluated Smith pursuant to the court’s ruling. Further, he had believed that the discovery order addressed evaluations that had been made by the State and had been part of its file, rather than evaluations made pursuant to a subsequent court ruling and that the prosecutor considered to be a part of the trial file. The prosecutor contended that the defense had known for months that Dr. King had evaluated Smith according to the court’s ruling and that a member of the defense team had agreed to exchanging information from Dr. King and certain defense experts on the day that the report was due to be turned over to Smith. Thus, the prosecutor argued that the defense knew the results of the evaluation and could not show any prejudice. The court then overruled the objection. It should be noted that the court had given defense counsel permission to have Smith evaluated again by an expert, but counsel decided against such action.
Here, the State did not fail to turn over the reports by Dr. King, although Smith challenges the timeliness of the discovery. However, Smith has failed to show that he was prejudiced as the result of any delay.
In Travis v. State, 776 So.2d 819 (Ala.Crim.App.1997), this Court stated:
“The State did not fail to disclose any Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) material, neither did it ultimately fail to turn over material discoverable under Rule 16, Ala.R.Crim.P., although it did not always do so as promptly as it should have.
“In Thomas v. State, 508 So.2d 310 (Ala.Cr.App.1987), upon similar facts, this Court concluded that the appellant was actually challenging the timeliness of the State’s compliance with the trial court’s discovery order. The Court concluded:
“ ‘ “The appellant provides no evidence that the untimeliness of the State’s compliance prejudiced her case. Moreover, this court has found that even if the State failed to comply with an order for discovery, the items may still be admissible because the State offered the defense counsel an opportunity to inspect and examine them in accordance with Rule 18.5(a), Alabama Temporary Rules of Criminal Procedure. Clemons v. State, 491 So.2d 1060 (Ala.Cr.App.1986).”
“‘Robinson v. State, 528 So.2d 343 (Ala.Cr.App.1986).’
“508 So.2d at 313.”
776 So.2d at 867. See also Parker v. State, 777 So.2d 937, 939 (Ala.Crim.App.2000) (Parker’s contention that the State violated the court’s discovery order directing the State “to produce or to make available at the discovery conference the results of any scientific or expert test to be used at trial,” as well as Rule 16.1, Ala.R.Crim.P., *1136 by revealing test results on the first day of trial lacked merit because the thorough cross-examination by defense counsel was not prejudiced). “ ‘Discovery matters are within the sound discretion of the trial judge. Williams v. State, 451 So.2d 411 (Ala.Cr.App.1984). The court’s judgment on these matters will not be reversed absent a clear abuse of discretion and proof of prejudice resulting from the abuse. Ex parte Harwell, 639 So.2d 1335 (Ala.1993).’ Parker v. State, 777 So.2d 937, 938 (Ala.Crim.App.2000).” Belisle v. State, 11 So.3d 256, 277 (Ala.Crim.App.2007).
E.
Although Smith argues that the circuit court selectively relied on evidence introduced at trial and exaggerated certain evidence, such as Smith’s criminal activity, there is no indication of improper or incorrect findings made by the circuit court as to the evidence.
“As the Alabama Supreme Court has explained, questions regarding weight and credibility determinations are better left to the circuit courts, ‘ “which [have] the opportunity to personally observe the witnesses and assess their credibility.” ’ Smith v. State, — So.3d at - (quoting Smith v. State, [Ms. CR-97-1258, Sept. 29, 2006] — So.3d -, - (Ala.Crim.App.2006) (Shaw, J., dissenting) (opinion on return to third remand)).
“ ‘This court reviews the circuit court’s findings of fact for an abuse of discretion.’ Byrd, 78 So.3d at 451 (citing Snowden v. State, 968 So.2d 1004, 1012 (Ala.Crim.App.2006)). ““ “ ‘A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.’ ” ”” Byrd, 78 So.3d at 450-51 (quoting Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005), quoting in turn State v. Jude, 686 So.2d 528, 530 (Ala.Crim.App.1996), quoting in turn Dowdy v. Gilbert Eng’g Co., 372 So.2d 11, 12 (Ala.1979), quoting in turn Premium Serv. Corp. v. Sperry & Hutchinson, Co., 511 F.2d 225 (9th Cir.1975)).”
Albarran v. State, 96 So.3d 131, 198 (Ala.Crim.App.2011).
Based on the evidence presented at the hearing, the circuit judge did not abuse his discretion in determining that Smith was not mentally retarded.
II.
Smith argues that the circuit court erred in ruling that his Sixth and Fifth Amendment rights were not violated by the State’s administration of Haldol to him before and during trial. Smith contends that the Haldol made him appear emotionless at trial and that the prosecutor capitalized on this effect by arguing that he was a cold killer and that he lacked remorse. Thus, he argues, he was denied a fair trial. He also argues that he was denied due process because he was involuntarily treated with this antipsychotic drug. Further, he submits that he was denied the effective assistance of counsel because his counsel did not investigate the State’s use of Haldol on Smith or object thereto.
The circuit court determined:
“[Smith] then asserts that he was denied his right to a fair trial by being given an antipsychotic drug called Hal-dol prior to trial. To the extent that this argument relates to the ineffective assistance of Smith’s trial court, it is not precluded by any of the procedural bars outlined in Rule 32, A.R.Cr.P. To the extent the argument does not relate to an ineffective assistance of counsel claim then it is precluded because it could *1137 have been raised at trial or on appeal but was not. Rule 32.2(a)(3) and (5), Alabama Rules of Criminal Procedure.
“[Smith] asserts that being under the influence of Haldol prevented him from showing any emotion during the trial or from assisting his counsel during the penalty phase. [Smith] asserts that the State improperly took advantage of this situation by pointing out his lack of remorse and pointing out that he appeared to be an emotionless killer. Attorneys for [Smith] called Dr. William Alexander Morton, Jr., an expert in the field of psychopharmacology. Dr. Morton testified about how Haldol reduces brain activity and makes an individual slow down and not respond to outside stimuli. Dr. Morton testified that Willie Smith was on Haldol when he came to prison from the county jail. Although Dr. Morton was unable to testify conclusively that [Smith] was on Haldol at the time of his trial, and Petitioner Smith did not testify regarding any medications he may have taken prior to trial, evidence presented by [Smith] would appear to indicate that Willie Smith was taking Haldol at the time his case proceeded to trial. If [Smith] was taking Haldol at the time of his trial, the next question which must be addressed is whether his counsel was ineffective in representing [Smith] as it relates to his use of Haldol. [Smith] claims that his trial counsel should have objected to the prosecutor’s comments regarding Mr. Smith’s lack of remorse, and argues that such an objection would have been even more necessary had defense counsel known the Defendant was taking Haldol. Yet, the record is clear that [Smith] did not tell his attorney that he was taking any medication, and neither of the two doctors who examined [Smith] prior to trial recognized any problems which could be directly attributed to such medication. Nor was anything else brought to counsel’s attention which would have caused either attorney to realize that [Smith] may have been taking some medication which could affect his demeanor. Based upon these findings, this Court cannot find that either of [Smith’s] trial attorneys were deficient or that their performance was below the standard called for in the first prong of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).”
(C. 72-73.)
A.
Smith claims that he was denied his right to a fair trial under the Sixth Amendment as a result of being given Haldol because he appeared emotionless at trial, allowing the prosecutor to characterize him as remorseless. Moreover, he contends, he was unable to interact with his counsel because of the Haldol, which also denied him a fair trial.
In his second amended petition, Smith raised his claims concerning the improper use of Haldol and, in the context of the Sixth Amendment, he argued that the drug resulted in his emotionless demeanor and allowed thé prosecutorial comment concerning his lack of remorse and prevented him from assisting his counsel during the penalty phase. He did not contend that it prevented him from interacting with his counsel during the guilt phase of trial. Thus, this part of his claim is not properly raised on appeal. Lee v. State, 44 So.3d 1145, 1162 (Ala.Crim.App.2009) (“A review of Lee’s amended Rule 32 petition shows that this issue was not presented in Lee’s petition. Thus, it is not properly before this Court because it is raised for the first time on appeal. ‘“[A]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.” ’ English v. State, *1138 10 So.3d 620, 621 (Ala.Crim.App.2007), quoting Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997).”). Moreover, there is no indication in the trial transcript of such an inability.
As to his claim that the Haldol made him appear emotionless and remorseless and prevented him from contributing to his defense during the penalty phase, as the circuit court determined, this issue could have been raised at trial or on appeal. Rule 32.2(a)(3) and (5). Compare Riggins v. Nevada, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (when defendant objected to the administration of anti-psychotic drug during trial, the State should have been required to show the necessity for the drug and any reasonable alternatives). Because Smith did not raise this issue at trial or on appeal, he is precluded from raising it now.
B.
Smith alleges that he was denied his due-process rights under the Fifth Amendment because, he says, he was forced to take Haldol during trial. He argues on appeal that due process allows a mentally- ill defendant to be involuntarily treated only if he is a danger to himself or others, and, Smith argues, he was not. He also contends that, because the Haldol did not further any important governmental interest and had side effects that interfered with his right to a fair trial, the State violated his due-process rights by forcing him to take Haldol.
However, Smith failed to raise this claim at trial or on appeal and it is therefore precluded from review. Rule 32.2(a)(3) and (5). Clayton v. State, 867 So.2d 1150, 1151-52 (Ala.Crim.App.2003) (Clayton’s claims in his Rule 32 petition that his due-process rights were violated were precluded because they could have been raised at trial).
C.
Smith argues that his counsel were ineffective because they did not investigate the State’s administration of Hal-dol to him during trial or object to its administration. The circuit court determined that Smith’s counsel were not ineffective under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because Smith did not tell them that he was taking any type of medication and because the experts who examined Smith did not note any problems or side effects that would have been attributable to Haldol.
In Lee v. State, 44 So.3d 1145 (Ala.Crim.App.2009), “ ‘Lee ... allege[d] that his trial counsel were ineffective for not investigating the amounts of drugs and alcohol in his system at the time of the shootings and for failing to use the surveillance videotape “to ascertain whether [Lee] was under the influence of drugs or alcohol” at the time of the robbery and murders.’ ” 44 So.3d at 1157. The circuit court determined that Lee failed to proffer any specific evidence that would have been discoverable to substantiate his claims of mental illness or drug and alcohol abuse. This Court stated that “ ‘[C]laims of failure to investigate must show with specificity what information would have been obtained with investigation, and whether, assuming the evidence is admissible, its admission would have produced a different result.’ Thomas v. State, 766 So.2d [860] at 892 [ (Ala.Crim.App.1998) ].” 44 So.3d at 1160. Lee failed to proffer specific discoverable evidence and, because “evidence of Lee’s mental health and substance abuse were presented to the jury,” he failed to show prejudice. Id.
In the present case, Smith has proffered no evidence to establish that his *1139 counsel knew or should have known that he was taking Haldol, if he was in fact administered that drug. Smith suggests that he “has offered a large amount of evidence demonstrating that he was drugged, including the reports from Holman Correctional Facility, the reports of Dr. Blotcky and Dr. Rosecrans regarding Mr. Smith’s affect during his meetings with them prior to trial, and the testimony of Dr. Morton.” (Smith’s brief, at 66.) However, none of the experts affirmed that Smith was taking Haldol or stated that Smith told them that he was being given Haldol in jail. The record indicates that Smith’s medical records from jail were not available. The reports from Holman Correctional Facility indicated that Smith self-reported that when he came from county jail he was on Haldol. (C. 1778.) In the “Progress Notes” from Holman Correctional Facility, the following entry states: “He [Smith] had apparently been given some Haldol in the County Jail, but there is no record of this in the file.” (C. 1785.) The notation appears to indicate that this information concerning the Haldol came from Smith. There is no other affirmation in the record that Smith had been given Haldol. One of Smith’s trial counsel testified at his hearing and, when asked on cross-examination whether Smith had ever complained about having been given Haldol, she responded that he had not.[17] Moreover, nothing in the record suggests that any Haldol was involuntarily or unknowingly administered to Smith.
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134, 102 S.Ct. 1558, 1574-1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, supra, 350 U.S. [91], at 101, 76 S.Ct. [158], at 164 [(1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Go-odpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L.Rev. 299, 343 (1983).
[[Image here]]
“Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on the facts of the particular, case, viewed as of the time of counsel’s conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside *1140 the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel’s function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.
[[Image here]]
“The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.”
Strickland v. Washington, 466 U.S. at 689-91.
Under these facts, there is no indication that Smith’s counsel knew, or reasonably should have known, that Haldol might have been administered to Smith. See People v. Williams, 364 Ill.App.3d 1017, 1027, 302 Ill.Dec. 254, 848 N.E.2d 254, 262 (2006) (under the two-prong test established in Strickland, Williams failed to prove ineffectiveness because his “postcon-viction petition did not allege that he told his trial counsel about his mental problems or his lack of treatment. Instead, he alleged that counsel should have taken the initiative and asked him if he was ‘mentally ill or under any psychiatric care.’ The record belies defendant’s allegation because defendant gave no indication that his judgment was impaired or he did not understand the proceedings.”). While there was testimony that Smith’s demeanor was consistent with that of someone who had taken Haldol, there was also testimony that Smith’s affect may have been caused by other reasons. Thus, Smith has failed to prove ineffectiveness on this ground, and the circuit court’s determination was not clearly erroneous.
III.
Smith argues that the circuit court erred in denying his -claim of ineffectiveness of counsel based on his trial counsel’s failure to fully investigate his level of intelligence and psychiatric condition, the inexperience of his lead penalty-phase counsel and her failure to investigate, his trial counsel’s failure to bring to the court’s and jury’s attention the fact that he was being given Haldol in response to the prosecutor’s comments concerning his lack of remorse, and his trial and appellate counsel’s failure to present evidence to show a history of discriminatory jury strikes by the prosecutor to support his Batson[18] motion.
A.
Smith contends that his trial counsel was ineffective for failing to investigate his level of intelligence and his psychiatric condition in order to present all mitigating evidence and to assure that Smith could adequately participate in his defense.
Initially, although Smith contends that counsel, in order to be effective, must investigate every possible defense, counsel is required to make only a reasonable investigation. As this Court stated in Brooks v. State, 929 So.2d 491 (Ala.Crim.App.2005):
“ ‘There is no doubt that counsel did not exhaustively investigate every single detail and aspect of this case. The law, however, does not require such and, in fact does not even require an investiga *1141 tion into every possible theory of defense. Moreover, because the chosen theory of defense was reasonable, “it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer’s pursuit of [a reasonable-doubt defense] was not a deliberate choice between [it and some other course].” Chandler v. United States, 218 F.3d 1305, 1316, n. 16 (11th Cir.2000) (en banc). The “inquiry is limited to whether [the chosen defense] might have been a reasonable one.” Id., citing Harich v. Dugger, 844 F.2d 1464, 1470-71 (11th Cir.1988) (en banc); Bonin v. Calderon, 59 F.3d 815, 838 (9th Cir.1995).’ ”
929 So.2d at 503-04.
As the State notes in its brief on appeal, Smith did not raise the issue of counsel’s failure to present evidence of his low intelligence as mitigation; therefore the circuit court did not make findings as to such an issue in its order. However, Smith did raise the issue of ineffectiveness concerning counsel’s failure to present evidence of his mental illness and retardation as mitigation.[19] The circuit court determined that counsel was not ineffective for failing to present such evidence because Dr. Blotcky provided mitigating evidence in the form of such information for Smith. The court further stated that, although Smith contended that another expert might have provided better evidence, “no such testimony was presented at the evi-dentiary hearing. Therefore, there is insufficient proof of Smith’s mental condition at the time of the offense to establish that his trial counsel was ineffective for not hiring a different expert.” (C. 80.) Moreover, the circuit court found from the evidence presented at the evidentiary hearing that Smith was not mentally retarded.
Although Smith argues that his counsel was ineffective for failing to present mitigating evidence concerning his mental condition and retardation, the trial court found his low intelligence and his mild retardation to be nonstatutory mitigating circumstances as to his sentence. On direct appeal of his conviction and sentence, this Court stated:
“The trial court also properly considered nonstatutory mitigating circumstances; the trial court made lengthy findings of such evidence which he considered. Summarily, the trial court stated:
“T find that [Smith’s] luckless childhood and troubled adolescence occasioned in large part by an abusive father, economic deprivations affecting [Smith’s] family, [Smith’s] verbal I.Q. of 75, classified as the borderline range between mild retardation and low-average intelligence, this position of co-defendant’s cases for the lesser offense of murder are all relevant factors to be considered in mitigation of the sentence.’ ”
Smith v. State, 838 So.2d at 477.
Smith’s counsel clearly investigated Smith’s mental condition as evidenced by counsel’s fee-declaration sheets, which were introduced by Smith at the evidentia-ry hearing. They indicate that counsel conferred with a psychologist on a number of occasions and also spoke with a psychiatric social worker.
*1142 At trial, Smith defended his case by attempting to impeach his codefendant through testimony concerning her plea agreement, through testimony that Smith and his mother had evicted her, and through testimony that the codefendant was not afraid of Smith. Smith’s mother also denied that Smith ever admitted to the murder in a telephone conversation. However, the evidence presented by the State was overwhelming. See Lee v. State, 44 So.3d 1145, 1169 (Ala.Crim.App.2009) (finding that, in light of the overwhelming evidence against Lee, counsel’s strategy of conceding guilt was not unreasonable and stating, “ ‘in a capital ease, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant’s best interest and the defendant is unresponsive, counsel’s strategic choice is not impeded by any blanket rule demanding the defendant’s explicit consent. Instead, if counsel’s strategy, given the evidence bearing on the defendant’s guilt, satisfies the Strickland standard, that is the end of the matter; no tenable claim of ineffective assistance would remain.’ ”). As the trial court in this case summarized in its order:
“ ‘Suffice it to say that the incriminating force of the whole evidence was overwhelming. The testimony of the witnesses summarized above as corroborated by [Smith’s] own recorded statements to Ms. Roshell, by other witnesses such as Michael Wilson who testified about [Smith’s] confessory statement, Maurice Leonard concerning jewelry owned by [Smith] as depicted in the bank photos and by the abundant physical evidence.’ ”
838 So.2d at 425.
Although defense counsel did not present evidence concerning Smith’s mental condition or retardation during the guilt phase, they did not perform ineffectively. Nor were they ineffective during the penalty phase by only using Dr. Blotcky’s findings as to this matter.
“ ‘[Debatable trial tactics generally do not constitute ineffective assistance of counsel. [State v.] Clayton, 62 Ohio St.2d [45,] 49, 402 N.E.2d 1189 [ (1980) ]. This court must indulge in a strong presumption that trial counsel’s conduct falls within the wide range of reasonable professional assistance. [State v.] Hartman, 93 Ohio St.3d [274,] 300, 754 N.E.2d 1150 [ (2001) ]. Significantly, the existence of alternative or additional mitigation theories generally does not establish ineffective assistance of counsel. [State v.] Combs, 100 Ohio App.3d [90,] 105, 652 N.E.2d 205 [(1994)].’”
Daniel v. State, 86 So.3d 405, 437 (Ala.Crim.App.2011), quoting Phillips v. Bradshaw, 607 F.3d 199, 206-07 (6th Cir.2010).
B.
Smith alleges that his lead trial counsel’s “presence” at trial “did not make up for” his other trial counsel’s inexperience and failure to investigate. (Smith’s brief, at 71.) Specifically, Smith argues that his lead counsel did not cross-examine any witnesses during the penalty phase or conduct any investigation for the penalty phase, and essentially left his cocounsel, who was participating in her first trial, to conduct the penalty phase. He further complains that her performance was ineffective because she did not request that Dr. Blotcky or Dr. Rosecrans conduct more appropriate testing. He states that because these experts did not conduct the proper tests, his counsel failed to present adequate evidence of his low intelligence and use of Haldol.
*1143 Cocounsel for Smith at trial acknowledged that his trial was her first time to appear at a trial. She testified that she attempted to obtain Smith’s school records. She was following up on information from Smith that he had attended special-education classes; however his records were no longer available. She therefore contacted an assistant principal, who remembered Smith and who testified for him at the penalty phase. Cocounsel stated that her duties were to conduct investigation for sentencing. She also testified that she was instructed “to a limited extent” by the lead counsel as to with whom to speak and what to investigate. (R. 60.) She stated that she spoke with Smith’s family members, as well as with members of the community in which he had lived. She testified that she was certain that she had spoken with Dr. Blotcky before the penalty phase, although she could not recall this. Cocounsel testified that lead counsel had previously represented capital defendants and that “he was with [her] during the entire time during the trial, during the guilt phase and the penalty phase.” (R. 62.) She confirmed that she discussed with him the interviews she had conducted and what she had investigated; however, they did not confer about what witnesses should be called or what facts should be elicited. She stated that lead counsel “was not very helpful.” (R. 62.) She testified that she introduced testimony concerning Smith’s upbringing and his severe drug abuse. Lead counsel, however, retained the services of Dr. Blotcky.
In its order following the evidentiary hearing, the circuit court stated as to this issue:
“Smith then outlines several reasons why his trial counsel was ineffective in representing him at the penalty phase of his trial. It appears that Smith is correct in asserting that [cocounsel] handled all the questioning of witnesses during the penalty phase and that this was [cocounsel’s] first time to appear in a criminal trial. Yet, the State of Alabama is likewise correct in noting that ‘the appellate courts of Alabama have held that only one attorney representing a capital defendant is required to meet the five-year prior experience requirement. See, e.g., Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001). There is no dispute that Smith’s lead defense attorney ... exceeded the statutory requirements for appointed representation.’ (p. 27, State’s Post-Hearing Memorandum addressing Smith’s Second Amended Rule 32 Petition). Contrary to [Smith’s] argument on pages 52 and 53 of his Petition, there is insufficient evidence to show that [lead counsel] excluded himself from the proceedings so as to treat the matter as if [lead counsel] was not present to assist [cocounsel]. In fact, [lead counsel] gave the closing argument of the defense after evidence was presented in the penalty phase. Since Smith did have an attorney who met the minimal five year requirement, in order to prevail regarding a claim of ineffective assistance of counsel at the penalty phase [Smith] is required to meet the elements outlined in Strickland v. Washington, supra.”
(C. 78.)
Moreover, the record on appeal indicates that lead counsel gave the closing argument to the jury at the penalty phase, as noted by the circuit court; further, during the sentencing phase before the trial court, he examined Smith’s sister and delivered the closing argument.
As to cocounsel’s failure to have Dr. Rosecrans and Dr. Blotcky perform what Smith says are the correct tests, Smith has failed to show that their testing was incorrect or misleading. Although these ex *1144 perts did not reach the results Smith may have desired, their testing has not been shown to have been faulty or inadequate. As this court stated in Hinton v. State, [Ms. CR-04-0940, August 26, 2011] — So.3d - (Ala.Crim.App.2008) (opinion on return to second remand):
“As the Alabama Supreme Court noted in quoting then Judge Shaw’s dissent to this Court’s original opinion affirming the circuit court’s denial of Hinton’s Rule 32 petition:
“ ‘ “If Payne was in fact a qualified firearms and toolmarks expert, even if his qualifications did not necessarily match up with those possessed by the State’s experts, then I would affirm the circuit court’s judgment denying Rule 32 relief. Sorting out conflicting testimony from qualified experts presented at trial is solely within the province of the jury. Rule 32 is not a mechanism by which those convicted of criminal offenses may argue many years after trial that they now have found better expert witnesses that a newly selected jury should hear....’”
“Ex parte Hinton, [Ms. 1051390, October 17, 2008] — So.3d [-,] at -[(Ala.2008) ] (quoting Hinton v. State, [Ms. CR-04-0940, April 28, 2006] - So.3d -, - (Ala.Crim.App.2006) (Shaw, J., dissenting)).”
— So.3d at -. Although newer tests become available periodically, as occurred concerning one. of the tests in this case, there is no indication that any such testing would have yielded different results.
Finally, as found by the circuit court, because Smith’s lead attorney had ample years of experience in criminal law and had previously tried cases involving the death penalty, Alabama law was not violated by cocounsel’s lack of experience. Section 13A-5-54, Ala.Code 1975, requires that “[e]ach person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years’ prior experience in the active practice of criminal law.” This Court stated in Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011):
“In Sale v. State, 8 So.3d 330 (Ala.Crim.App.2008), cert. denied, 8 So.3d 352 (Ala.2008), cert. denied, Sale v. Alabama, - U.S. -, 129 S.Ct. 2062, 173 L.Ed.2d 1141 (2009), this court stated:
“‘“We have held that § 13A-5-54, Ala.Code 1975, requires only that one attorney meet the statutory requirements. ‘In Parker v. State, 587 So.2d 1072 (Ala.Crim.App.1991), we held that when a person accused of a capital offense has one attorney whose experience meets that required in § 13A-5-54, the requirements of that section have been satisfied.’ Hodges v. State, 856 So.2d 875, 899 (Ala.Crim.App.2001).” Belisle v. State, 11 So.3d 256, 279 (Ala.Crim.App.2007). Furthermore, a defendant in a capital case is entitled to only one attorney with five years’ experience. See Robitaille v. State, 971 So.2d 43, 51-52 (Ala.Crim.App.2005); and Whitehead v. State, 777 So.2d 781, 851 (Ala.Crim.App.1999).’
“Sale v. State, 8 So.3d at 341.”
Revis v. State, 101 So.3d at 227. Therefore, because Smith’s lead counsel had the requisite experience, his claim fails.
C.
Smith contends that his counsel was ineffective during the penalty phase of his trial for failing to bring to the attention of the judge and jury the fact that Haldol was being administered to him. Smith argues that this was particularly prejudicial due to the prosecutor’s comments dur *1145 ing his closing argument concerning Smith’s apparent lack of remorse.
However, as discussed in Issue II of this opinion, there is no indication that Smith informed his counsel that he was being given Haldol nor is there any indication that his counsel should have reasonably believed that to be the case. Further, a prosecutor may properly comment on a capital defendant’s lack of remorse and often does so. On direct appeal (opinion on return to remand), Smith alleged that the prosecutor’s comments concerning his lack of remorse were indirect comments on his failure to testify. This Court stated:
“The appellant argues that the prosecutor made indirect comments on his choice not to testify through the following two comments made by the prosecutor at his closing argument during the penalty phase of trial:
“ T see no remorsefulness. I see no remorsefulness now, probably no re-morsefulness then, and probably never will be any remorsefulness.’
“ ‘And he sits here and does not shed one tear, not even one tear for his mother sitting on this stand begging for his life. All he can do is close his eyes.... ’
“In Ex parte Loggins, 771 So.2d 1093, 1099 (Ala.2000), Loggins argued that the prosecutor had made improper comments during his closing argument in the penalty phase of the trial by stating: ‘ “And throughout every word you’ve heard from this witness stand in this courtroom this entire week has there been an iota of remorse? None. Absolutely none.” ’ Loggins argued that this argument by the prosecutor constituted a direct comment on his failure to testify. The Alabama Supreme Court found no merit to this argument stating:
“ ‘Not every comment that refers or alludes to a nontestifying defendant is an impermissible comment on his failure to testify; the prosecutor has a right to comment on reasonable inferences from the evidence:
“ ‘ “ ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference. Rutledge v. State, 523 So.2d 1087 (Ala.Crim.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, no fixed standard can be applied, and each case must be judged on its own merits. Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988).’
[[Image here]]
“ ‘... Moreover, remorse is also a proper subject of closing arguments. Dobyne v. State, 672 So.2d 1319, 1348-49 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996).
[[Image here]]
“ ‘... Harris v. State, 632 So.2d 536 (Ala.Crim.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (wherein this Court held that a reference, during the sentencing stage of the trial, to the defendant’s lack of remorse was not improper argument, where testimony introduced at trial had indicated that *1146 the defendant’s reaction to being informed of her husband’s death was so unemotional that she was questioned concerning her reaction); Dobyne, supra, 672 So.2d at 1348-49 (wherein this Court held that a prosecutor’s comment regarding the defendant’s lack of remorse, made during the penalty phase of the trial, was a comment “on the [defendant’s] demeanor when he made his statement to police”).’
“Ex parte Loggins, 771 So.2d at 1101— 02.
“Examining this comment made by the prosecutor in the context of his entire argument, it is clear that he was referring to [Smith’s] demeanor and was drawing inferences and conclusions from the evidence. Testimony was presented that [Smith] bragged that he had shot the victim.”
Smith v. State, 838 So.2d at 458-59.
As the comments by the prosecutor concerning Smith’s lack of remorse indicate, they were based not only on his demeanor at trial but also on his behavior at the time of the offense, including the evidence that he bragged about the murder to others. There is no contention by Smith or indication in the record that Haldol had been administered to him at the time of the offense. Therefore, based on counsel’s apparent lack of knowledge concerning the administration of Haldol to Smith, as well as the nature of the prosecutor’s comments that referred to Smith’s lack of remorse at the time of the offense and following, as evidenced by his statements to others, Smith has failed to show ineffectiveness as to this claim.
D.
Smith argues that his trial and appellate counsel were ineffective as to his Batson claim, because, he says, they failed to provide evidence to support his contention that the prosecutor had a history of discriminatory strikes. Despite this claim, Smith alternatively alleges that the circuit court erred by ignoring his trial counsel’s argument as to this matter, as shown in this Court’s opinion on direct appeal,[20] wherein the following occurred:
“[Defense counsel]: ... We also bring to the Court’s attention that this prosecutor’s office has been reversed on many, many, many occasions for systematically excluding blacks.
“THE COURT: I don’t agree with that, I really don’t.
“[Defense counsel]: Judge, I have reversed them myself—
“THE COURT: Many, many, many, many occasions?
“[Defense counsel]: Many times.
“THE COURT: This is [prosecutor,] a very prominent black attorney—
“[Defense counsel]: Yes, sir, I understand that, Judge.
“THE COURT: That I have worked with and you have too.
“[Defense counsel]: Yes, sir. But also this same attorney came out in the paper, was quoted as saying that prosecutors do not use their strikes to eliminate blacks. And we feel like at least a pri-ma facie case has been made out.
“THE COURT: Well, I respectfully call your attention to the record, Ms. G., the one that leans to the defendant; Ms. 0., who has a problem with capital punishment. Ms. H., who is nervous and doesn’t want to see the pictures, she’s on whatever that stuff is—
[[Image here]]
*1147 “THE COURT: And I have sat up here for 10 years and I know that — well, I don’t want to say too much because you will say I am putting words in their mouths.
“[Defense counsel]: Yes, sir.
“THE COURT: So I don’t want to say anything else but other than to decline to say that you have made a prima facie case, [defense counsel].
“[Defense counsel]: Even with the Hispanic, Judge and no—
“THE COURT: I am going to stand pat and say that you have not made out a prima facie case of discriminatory striking.”
698 So.2d at 1168-69 (footnotes omitted). Although the circuit court found that Smith failed to make a prima facie case of discrimination in the prosecutor’s strikes of potential jurors, defense counsel clearly made an argument concerning the prosecutor’s history of discriminatory strikes. Appellate counsel also gave a persuasive argument concerning the prosecutor’s strikes waged against female potential jurors, as evidenced by this Court’s decision to remand this cause. See J.E.B. v. State, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
Moreover, following the evidentiary hearing pursuant to Smith’s Rule 32 petition, the circuit court stated in its order:
“This Court is of the opinion that this argument is without merit for several reasons. First, at the Rule 32 evidentia-ry hearing [Smith] did not specify how [defense counsel’s] ‘extensive knowledge’ of prior discrimination by the Jefferson County District Attorney’s Office would have, if sufficiently conveyed to the court, successfully resulted in his Batson motion being granted. Furthermore, it appears that ‘fourteen of [the State’s] fifteen strikes [were] to eliminate prospective jurors of the female gender.’ The State’s decision to strike each of these fourteen prospective female jurors was sufficiently addressed on remand by the trial court. The Court of Criminal Appeals of Alabama held that ‘[a]ll of the reasons given by the prosecutor for his strikes of these potential jurors were sufficiently facially gender neutral’ Smith v. State, 838 So.2d 413, 436 (Ala.Crim.App.2002). Based upon the appellate court’s standard of review in death penalty cases, if any of the reasons given for striking said jurors violated Batson, then the court would have been obligated to find plain error and address that issue. Yet, the appellate court did not find any error or any improper motive in the prosecutor’s strikes. Since the appellate court held that fourteen of the fifteen strikes were proper, the only issue which would need to be addressed was the State’s decision to strike the one remaining male juror. Based upon this court’s summary of the State’s strikes, although not entirely clear, it appears the only remaining strike by the prosecution was a white male. (RT. 448-455). Therefore, any claim of a Batson violation would be without merit. Even if this conclusion regarding the fifteenth juror struck by the State being a white male is incorrect, the Petitioner has failed to sufficiently carry his burden at the evidentiary hearing as it relates to this issue.”
(C. 81-82.) On appeal of the denial of his Rule 32 petition, Smith challenged his counsel’s (at trial and on appeal) effectiveness specifically only for failing to support his claim of a history of discrimination by the prosecutor. The record affirms that trial counsel effectively argued this ground to the trial court, and this Court’s remand indicates that appellate counsel effectively argued discrimination by the prosecutor. *1148 Therefore, Smith has failed to prove ineffectiveness on this ground.
IV.
Smith argues that the circuit court erred by dismissing his claim that his constitutional rights were violated because of a Batson violation. The circuit court determined that this claim was precluded and stated:
“[Smith] then claims that the State’s use of peremptory challenges to remove African Americans, Latinos, and women violated Batson v. Kentucky and J.E.B. v. Alabama, [511 U.S. 127 (1994)] (p. 132-151). Although [Smith] cites a significant amount of caselaw in support of this argument, the State is correct in asserting that Smith is precluded from relief as it relates to these issues. These issues were raised at trial and on direct appeal; therefore, they are precluded by Rules 32.2(a)(2) and (4). To the extent that they were not raised at trial or on appeal, they are precluded by Rule 32.2(a)(3) and (5).”
(C. 86.)
The circuit court properly determined that this issue is precluded because it has been raised and addressed both at trial and on appeal. See Smith v. State, 838 So.2d at 425-36 (as to female potential jurors) and 464-66 (as to the Hispanic and African-American potential jurors). Moreover, although Smith further requests that this Court also examine this issue as a claim of ineffectiveness of counsel, he makes this bare request without any supporting basis of ineffectiveness. In fact, he breaks down this claim as to discriminatory strikes entered against African-Americans, the Latino, and women and then solely faults the trial court for its decision without indicating that his counsel did not perform effectively. He then argued that the State failed to engage in any meaningful voir dire examination of the potential female jurors and that certain reasons given by the State for its strikes, specifically that it struck all people with church affiliations and with law-school experience, were pretextual. Smith also cited the prosecutor’s striking of a potential juror as young, unresponsive, and apparently afraid, as having been a sham. However, in each instance, Smith has failed to allege any ineffectiveness of counsel as to these strikes. Therefore, Smith has failed to establish the requisite specificity as to these claims and, in his brief on appeal, he has failed to cite any authority to support this claim of ineffectiveness. Rule 28(a)(10), Ala.R.App.P. (providing that the brief of an appellant shall contain “an argument containing the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on”). “Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed. Gay v. State, 562 So.2d 283, 289 (Ala.Crim.App.1990).” Hamm v. State, 913 So.2d 460, 486 (Ala.Crim.App.2002). This rule has been applied to appellate briefs addressing Rule 32 petitions of convictions of capital murder resulting in death penalties. See also McWhorter v. State, [Ms. CR-09-1129, September 30, 2011] — So.3d -, - (Ala.Crim.App.2011); Taylor v. State, [Ms. CR-05-0066, October 1, 2010] - So.3d -, - (Ala.Crim.App.2010).
Therefore, Smith’s contention regarding the violation of his constitutional rights pursuant to Batson is precluded from review, and his allegation of ineffectiveness of counsel based on his Batson claim is insufficiently pleaded and presented.
*1149 Y.
Smith argues that Alabama’s method of execution violates the cruel and unusual punishment clause of the Eighth Amendment. In his brief, Smith contends that despite the United Supreme Court’s decision in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), the use of lethal injection should be constitutionally impermissible.
The circuit court in its order dismissing Smith’s Rule 32 petition, stated as to this issue:
“[Smith] then asserts that lethal injection violates the Eighth Amendment to the United States Constitution because it subjects an individual to cruel and unusual punishment. This argument was made and filed in Smith’s Petition before the United States Supreme Court rejected a constitutional challenge to a similar lethal injection procedure administered in Kentucky. Baze v. Rees, 128 S.Ct. 1520 (2008). Based upon the aforementioned holding, this argument by [Smith] is without merit. Furthermore, [Smith] has failed to meet his burden as it relates to any argument or facts that may differ from those presented to the Court in Baze v. Rees, supra.”
(C. 74.) As found by the circuit court, this issue has been determined adversely to Smith’s argument and he has failed to distinguish his claim from established caselaw.
“This issue has been addressed by both the Alabama Supreme Court and the United States Supreme Court. In Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
“ ‘ “The Supreme Court' upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520] 1538 [ (2008) ], and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance— missing from Kentucky’s protocol— that the first drug had been properly administered.’ Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“ ‘ “The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
“ ‘11 So.3d at 339. See also Vanpelt v. State, 74 So.3d 32, at 90 (Ala.Crim. *1150 App.2009) (holding that lethal injection is not unconstitutional).
“ ‘Because this issue has been raised and rejected by the Alabama Supreme Court, the United States Supreme Court, and this Court, it is without merit.’ ”
Wilson v. State, [Ms. CR-07-0684, March 23, 2012] - So.3d -, - (Ala.Crim.App.2010)(opinion on return to remand), quoting Albarran v. State, 96 So.3d 131, 202 (Ala.Crim.App.2011). Therefore, the circuit judge properly denied this claim and his decision was not clearly erroneous.
VI.
Smith alleges that he was denied his Fourteenth Amendment due-process rights to have the facts of his case determined by the jury, in violation of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
As to this issue, the circuit court found:
“Smith’s final claim addresses an allegation that the trial court improperly considered facts not presented to the jury before making its recommendation that Smith be sentenced to death. In particular, [Smith] asserts that
“ ‘the trial court in this case made the factual determination that the mitigating circumstance that [Smith] acted under extreme mental or emotional disturbance at the time of the trial did not exist. (C.R. 163) The court based its finding on the reports of Dr. C.R. Rosecrans and Dr. Alan Blotcky. Dr. Rosecrans did not testify at any phase of the trial nor was his report in evidence before the jury. (C.R. 159). Dr. Blotcky testified before the jury at the penalty phase, but his report was not in evidence and he did not testify to the absence of this miti-gator.’ (p. 156, Rule 32 Petition).
“The argument made by [Smith] is based upon Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000).
“Without making a determination as to whether this issue is procedurally barred, this Court finds that [Smith] is not entitled to relief based upon this argument. Based upon this Court’s review of the record, it does not appear that the defense presented evidence to prove the mitigating circumstance that the ‘capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.’ § 13A-5-51, Code of Alabama (1975). On direct appeal, the Court of Criminal Appeals of Alabama addressed a related issue and held that Judge Hard’s reference to Dr. Rosecrans’s and Dr. Blotcky’s reports was not prejudicial to the defendant nor was it plain error. Smith v. State, 838 So.2d 413, 445 (Ala.Crim.App.2002). This Court is of the opinion that Judge Hard’s reference to Dr. Rosecrans and/or Dr. Blotcky in no way implicates the holdings in Ring v. Arizona, 536 U.S. 584 (2002), or Apprendi v. New Jersey, 530 U.S. 466 (2000). If the offense of conviction had not included an aggravating circumstance outlined in § 13A-5-49, Code of Alabama (1975), then Ring would have been applicable. Yet, Judge Hard’s Order was merely noting that there was no evidence presented by the defense of one of the statutory mitigating circumstances. If the court had used improper evidence to find that an aggravating circumstance existéd, then a separate set of factors would have to be considered. Yet, the trial court’s mention of Dr. Rosecrans and Dr. Blotcky’s reports does not change the Court’s conclusion that ‘no *1151 evidence adduced at trial, nor at the second stage in front of the jury, nor by way of evidence adduced at the third stage’ proved any ‘extreme mental or emotional disturbance.’ Therefore, [Smith] is not entitled to relief under Rule 32, based upon his claim.”
(C. 87-88.)
In the present case, Smith was convicted of capital murder for committing intentional murder during the course of a robbery and during a kidnapping. As this Court stated in Wilson v. State, [Ms. CR-07-0684, March 23, 2012] — So.3d -(Ala.Crim.App.2010) (opinion on return to remand):
“In Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the Alabama Supreme Court held:
“ ‘[W]hen a defendant is found guilty of a capital offense, “any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.” Ala.Code 1975, § 13A-5-45(e)....
‘“Because the jury convicted Wal-drop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was “proven beyond a reasonable doubt.” Ala.Code 1975, § 13A-5 — 45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Waldrop’s case, the jury, and not the trial judge, determined the existence of the “aggravating circumstance necessary for imposition of the death penalty.” Ring [v. Arizona ], 536 U.S. [584,] 609, 122 S.Ct. [2428,] 2443 [(2002)]. Therefore, the findings reflected in the jury’s verdict alone exposed Wal-drop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] require.’
“859 So.2d at 1188 (footnote omitted). The Alabama Supreme Court reaffirmed its holding in Ex parte Waldrop in Ex parte Martin, 931 So.2d 759, 770 (Ala.2004).”
— So.3d at -. Thus, because by finding Smith guilty of the offenses for which Smith was convicted, the jury made a finding regarding the aggravating circumstances, and neither Ring nor Apprendi were violated.
Moreover, although Smith contends that the circuit court improperly[21] considered the reports from Dr. Rosecrans and Dr. Blotcky in determining that the mitigating circumstance of impairment caused by emotional or mental disturbance did not exist, this is not a concern recognized under Ring or Apprendi. Both cases pertain to the jury being allowed to determine facts that may increase, rather than decrease, the defendant’s sentence. See Apprendi, 530 U.S. at 490 (“Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the *1152 rule set forth in the concurring opinions in that case: ‘[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.’ [ Jones v. United States] 526 U.S. [227], at 252-253, 119 S.Ct. 1215 (opinion of Stevens, J.); see also id., at 253, 119 S.Ct. 1215 (opinion of Scalia, J.).”).
As this Court has held, because the jury specifically found that the aggravating circumstances existed-i.e., that the capital offense was committed during the course of a kidnapping and a robbery — this finding made Smith eligible for the death penalty. See Wilson v. State, [Ms. CR-07-0684, March 23, 2012] — So.3d - (Ala.Crim.App.2012); Thompson v. State, [Ms. CR-05-0073, February 17, 2012] - So.3d - (Ala.Crim.App.2012); Whatley v. State, [Ms. CR-08-0696, December 16, 2011] — So.3d - (Ala.Crim.App.2011); Revis v. State, 101 So.3d 247 (Ala.Crim.App.2011); Dotch v. State, 67 So.3d 936, 1005 (Ala.Crim.App.2010); Ex parte Martin, 931 So.2d 759, 770 (Ala.2004). Alabama’s sentencing scheme is not unconstitutional under Ring or Apprendi.
Based on the foregoing, the circuit court’s denial of Smith’s Rule 32 petition is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.

. The United States Supreme Court’s decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), was not released until after Smith’s conviction and sentencing. See Morrow v. State, 928 So.2d 315 (Ala.Crim.App.2004).

. The testing of Smith's brother placed Smith, who was 17, at a skill level of 12 years and 8 months, whereas Smith's mother’s testing placed him at 15 years and 3 months.

. Presumably by "they” the prosecutor was referring to the medical staff at the Holman Correctional Facility.

. Smith objected to Dr. King's testimony as well as his reports and data because of the tardiness of the State's compliance with a discovery order. The prosecutor responded that the defense had known that the evalúa *1118 tion had taken place approximately 10 months before the hearing; that he had agreed to exchange the information at a meeting with Smith’s counsel on the Friday before to the hearing and had done so; and that he had not understood the discovery order to include the posttrial evaluation. The court determined that because the defense was being afforded additional time to have Dr. Van Rosen evaluate Smith, they could make any further response at that time.

. Dr. King testified that this test examines the same abilities as the Woodcock Johnson Test that had been administered to Smith by Dr. Salekin.

. The court noted that, if it was disclosed during trial, the issue is precluded because it could have been raised at that time.

. The court also found that the issue could have been raised at trial. Rule 32.2(a)(3).

.Smith was convicted of murder made capital because it was committed during a kidnapping and murder made capital because it was committed during a robbery, so that the offenses involved different elements.

. The court noted as to this issue that there was no evidence indicating that Smith was using drugs on the day of the offense and that defense counsel presented expert testimony concerning Smith’s diminished capacity.

. The circuit court noted that he searched the pretrial portion of the trial transcript and found no indication of bias.

. The court noted that although counsel had failed to do so, Smith had not met his burden of proof as to prejudice.

. Smith makes blanket allegations on this ground and cites only one reference in the record; that argument concerned the victim’s role as a family member and was held on appeal not to constitute plain error.

. Smith specifically named certain witnesses but did not proffer their testimony at the hearing.

. The circuit court noted that there was no evidence or pleading indicating that either witness (Ms. Johnson and Ms. Willis) testified untruthfully and further noted that Smith had failed to show sufficient prejudice on this ground.

. The circuit court noted that even the evidence at the evidentiary hearing failed to show that Smith was incompetent to stand trial or that he was unable to appreciate the wrongfulness of his acts.

"3 See 851 So.2d at 456 n. 3 for a list of statutes referenced. Moreover, Morrow v. State, 928 So.2d 315, 323-24 n. 8, 9, and 10 (Ala.Crim.App.2004), provides a list of states that have created procedures for determining mental retardation legislatively and judicially and sets out states’ varying requisite burdens of proof.”

. An excerpt of the order, however, was read by Smith’s counsel at the hearing.

. She was not questioned as to this matter by Smith’s counsel.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. To the extent that Smith argues that the circuit court did not adequately address this issue in its findings, Smith did not object to the order denying his Rule 32 petition; therefore, this issue is not preserved for review. Robinson v. State, 869 So.2d 1191, 1193 (Ala.Crim.App.2003) ("Initially, we note that Robinson did not first raise his contention regarding the lack of specific findings of fact in the circuit court. Because he did not first present this claim to the circuit court, he has not preserved it for appellate review. Whitehead v. State, 593 So.2d 126 (Ala.Crim.App.1991).”).

. This Court remanded this case based on the prosecutor’s striking of female jurors.

. Smith argues that the court’s consideration of these reports was improper because they were not in evidence and because the jury never considered them.